Joseph A. VALENTI, Pittsford, New York, for himself and for all persons similarly situated, Plaintiff,

v.

Nelson A. ROCKEFELLER, Governor of the State of New York, Albany, New York; and John P. Lomenzo, Secretary of State of the State of New York, Albany, New York, Defendants.

Civ. A. No. 1968–224, W.D.N.Y.

Randolph PHILLIPS, Nina Phillips, Samuel J. Phillips, Patricia N. Berman and Elizabeth Bobrick, in their own right individually and as members of The Committee for Fair Play for Voters, Plaintiffs,

v.

Nelson A. ROCKEFELLER, Governor of the State of New York; and John P. Lomenzo, Secretary of State of the State of New York, Defendants.

George BACKER, Individually and on behalf of the Citizens, Residents and Voters of the State of New York, Plaintiffs,

v.

Nelson A. ROCKEFELLER, Governor of the State of New York, Defendant.

Nos. 68 Civ. 2942, 68 Civ. 2988, S.D.N.Y.

United States District Court.

Nov. 12, 1968.
Judgment Affirmed Jan. 20, 1969.
See 89 S.Ct. 689, 693.

Robert L. Bobrick, New York City, for plaintiffs, Randolph Phillips, and others.

Jerome M. Kay, New York City, for plaintiff, George Backer.

John Manning Regan, Hogan & Regan, Rochester, N. Y., for plaintiff, Joseph A. Valenti.

Ruth Kessler Toch, Sol. Gen., and Jean M. Coon, Asst. Atty. Gen., of counsel, Louis J. Lefkowitz, Atty. Gen., of the State of New York, for defendants.

Before LUMBARD, Chief Circuit Judge, HENDERSON, Chief District Judge and FRANKEL, District Judge.

**LUMBARD, Chief Circuit Judge:**

These three suits brought by New York voters[1] against the Governor and the Secretary of State sought a determination that the Seventeenth Amendment to the United States Constitution requires that the Senate vacancy created by the death of Senator Robert F. Kennedy on June 6, 1968, be filled at the November, 1968 general election. Since this vacancy arose less than 60 days prior to New York's regular spring primary in an even-numbered year, under New York Election Law § 296 the vacancy will be filled at the general election in the next even-numbered year, in this instance November, 1970. The Governor is empowered to make a temporary appointment, with the appointee serving until December 1, 1970.[2]

Plaintiffs contend that § 296, by authorizing a delay of approximately 29 months before an election is held to fill this Senate vacancy, infringes upon the principle of popular election of Senators declared by the Seventeenth Amendment, and violates the vacancy provision of that Amendment:

> When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: Provided, that the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.

Plaintiffs read this provision as permitting a "temporary" appointee to serve only until the vacancy can be filled by the people at the next "regularly scheduled election if there is sufficient time between the happening of the vacancy and the scheduled election."[3] In the circumstances of this case they argue that the election must be held in November, 1968, even though the candidates for the vacancy could not have been selected this year through the state's normal procedure[4] of nominations by the party committee in March or April followed by a popular primary in June preceding the election.

We hold that the provisions of New York Election Law § 296 do not

---

1. The Attorney General does not attack plaintiffs' standing, as voters of New York, to bring this action. We find that this case presents that "concrete adverseness" which is the "gist" of the standing question, Baker v. Carr, 369 U.S. 186, 205, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and hold that plaintiffs alleging that their right to vote to fill a Senate vacancy will be curtailed, have sufficient standing to maintain this action.

See Gray v. Sanders, 372 U.S. 368, 375, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963).

2. On September 10, 1968, Governor Rockefeller appointed Representative Charles Goodell to fill the vacancy.

3. Brief of plaintiff Valenti, pp. 15–16.

4. Election Law § 131 (McKinney Supp. 1968).

exceed the discretion conferred on the states by the Seventeenth Amendment with respect to the timing of vacancy elections and the procedures to be used in selecting candidates for such elections. Substantial state interests are furthered by the decisions of the New York Legislature that Senate vacancy elections be held only in conjunction with regular congressional elections, and that candidates for vacancy elections be selected through the state's modified direct primary system.

■ Our decision is strongly influenced by the fact that from the ratification of the Seventeenth Amendment in 1913 down to the present day most state legislatures have interpreted its provisions as authorizing the enactment of vacancy election statutes very similar to the New York law attached here. Accordingly we find that an election in November, 1970 to fill this Senate vacancy will be in compliance with the Amendment.

These actions were commenced almost simultaneously, the Valenti suit in the Western District of New York on July 16, and the Phillips and Backer suits in the Southern District of New York on July 17 and 19 respectively. On July 29, 1968, Chief Judge Henderson certified the need in the Valenti case for the appointment of a three-judge court, 28 U.S.C. §§ 2281, 2284, and Judge Frankel did likewise with regard to the other two suits on July 30. To facilitate prompt disposition of the common question, iden-

tical three-judge courts were designated in each case; Judge Henderson was assigned to sit as the third judge in the Southern District cases and Judge Frankel was assigned to sit as the third judge in the Western District case. By agreement of all the parties argument of all three cases was heard on August 7th in the Southern District.

A brief review of the New York legislation dealing with Senatorial vacancy elections is in order before we examine the current § 296 in the light of the Seventeenth Amendment. Under the state's first statute the vacancy election was to be held at the next annual November general election which occurred at least 30 days after the vacancy arose. Laws 1913, ch. 822. In 1947 the law was amended to require that the election be held at the annual November election in the first year in which at least 60 days intervened between the creation of the vacancy and the September fall primary. Laws 1947, ch. 623. If either of these two laws were in effect today the vacancy caused by the death of Senator Kennedy would have been filled at the November, 1968 election.

■ However, under the terms of Laws 1951, ch. 257, a Senatorial vacancy election must be held in an even-numbered year. Furthermore, New York now conducts its primary election in June rather than in September. Laws 1965, ch. 1070, applying by its terms to Election Law § 296.[5] The candidates for a Senate vacancy must be selected at this

---

5. Election Law § 296 actually uses the word "fall" rather than "spring" primary. But New York in 1965 replaced its fall primary with a spring primary to be held each third Tuesday in June. Laws 1965, ch. 1070 (effective Jan. 1, 1966.). Election Law § 191(1)(a) (McKinney Supp.1968), provides that all references to fall primaries in the Election Law shall be construed as references to the spring primary "whenever appropriate and applicable." Plaintiffs Backer and Phillips argue that § 296 presents one instance where such a construction is not appropriate, and that therefore as a matter of state law the vacancy elec-

tion must be held in November, 1968. However, they cite no support for this argument.

Since we agree with the Attorney General and plaintiff Valenti that the application of § 191(1)(a) to § 296 is not "fairly subject to dispute," Zwicker v. Koota, 389 U.S. 241, 251, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967), this court need not abstain from deciding the constitutional question presented until a state court has had an opportunity to construe this issue of statutory construction. See Davis v. Mann, 377 U.S. 678, 690–691, 84 S.Ct. 1441, 12 L.Ed.2d 609 (1964).

primary, unless the nominees chosen by the party committees prior to the primary are not challenged. Election Law § 131, subd. 2(d) (McKinney Supp.1968). Therefore, under current New York law the vacancy involved in this case cannot be filled either at the 1968 election, since it occurred less than 60 days prior to the spring primary on June 18, or at the election to be held in the odd-numbered year of 1969. The interval of 29 months which will occur in this instance between the vacancy and the election to fill it in November, 1970, is only six weeks shorter than the maximum interval possible under the terms of § 296.

Plaintiffs' main argument has been that the Seventeenth Amendment requires the vacancy election to be held in November, 1968.[6] In effect, they ask us to hold that the importance under the Amendment of holding a prompt election outweighs the state's interest in following its normal procedure for the selection of candidates through a spring primary. New York Election Law § 131, as amended Laws 1967, ch. 716, § 2. Had we required that the election be held in 1968, presumably the nominees would have had to have been selected by the state committee of each party pursuant to Election Law § 131(7), without

the possibility of these selections being challenged at a direct primary.

Since we reject the suggestion that an election in 1968 is constitutionally required, we must also answer another question: Does the Seventeenth Amendment prohibit New York from bypassing its general election in 1969 in favor of filling the vacancy in November, 1970?

In order to assess the constitutionality of § 296 as applied in the circumstances of this case we turn first to the wording of the Seventeenth Amendment.

■■ The Seventeenth Amendment's vacancy provision explicitly confers upon the state legislatures discretion concerning the timing of vacancy elections. If the legislature authorizes the governor to make a temporary appointment, the appointee may hold office "until the people fill the vacanc[y] by election *as the legislature may direct*." (emphasis added) Despite this clear language plaintiffs contend that the proviso only allows the legislature to regulate the governor's power of temporary appointment and not the timing of vacancy elections. They base their interpretation on a rather subtle reading of the 1892 congressional resolution which first contained this vacancy provision.[7] But

6. Regardless of the constitutional merits of plaintiffs' argument for a 1968 election, all members of this court have been agreed since the oral argument, held on August 7, that such a remedy was not possible from a practical standpoint in this instance. It was obvious after argument that this court would be compelled to do considerable research on the case before handing down any opinion and that an appeal to the Supreme Court was a virtual certainty. Thus sufficient time would not remain following the final resolution of this litigation to permit the political parties to nominate candidates and conduct a campaign prior to the election on November 5th. In view of this conclusion that the vacancy could not, in any event, be filled at the 1968 November election we took no action regarding the motion of plaintiff Valenti, filed September 23, for an order suspending certain provisions of New York's election law to make possible an election this year.

7. In 1892 Rep. Tucker of Virginia proposed a constitutional amendment which provided for the direct election of Senators, and also contained the following language:

"The times, places, and manner of holding elections for Senator shall be prescribed in each State by the legislature thereof.

When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided*, that the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election, as the legislature may direct." H.R.Rep. No. 368, 52d Cong., 1st Sess. 1 (1892).

The vacancy provision in this latter paragraph is identical to the one incorporated in the Seventeenth Amendment in 1912, with the exception that in the

we believe that we must give effect to the natural reading of the Seventeenth Amendment as adopted since there is no indication that the Congress which proposed the Amendment, or the state legislatures which ratified it, intended a different meaning. This natural reading grants to the states some reasonable degree of discretion concerning both the timing of vacancy elections and the procedures to be used in selecting candidates for such elections. This interpretation gains support from Art. 1, § 4 of the Constitution which gives to the state legislatures the initial power to prescribe the "Times, Places and Manner of holding Elections for Senators and Representatives * * *. If the drafters of the Seventeenth Amendment had intended to bring about a radical departure from this normal rule of state discretion in the instance of the timing and manner of holding vacancy elections, such as by requiring special elections, it is likely that they would have employed clear language to that effect; of course they did employ such clear language in requiring that the states elect their Senators through a popular vote.

But we do agree with plaintiffs that the Amendment's drafters did intend to place some limit on the discretion of the states concerning the timing of vacancy elections by specifying that a Governor may make only a "temporary" appointment until an election is held. We would have difficulty, for example, squaring the word "temporary" with a statute providing that the Governor's appointee is to serve out the remainder of a term regardless of its length. The question before this court is whether § 296 exceeds the limits of the discretion conferred upon the states by the Amendment.

It is highly significant that most legislatures, as indicated by the Senatorial vacancy statutes of the 50 states,[8] have interpreted the Seventeenth Amendment as granting to the states a discretion concerning the conduct of vacancy elections sufficiently broad to encompass the terms of New York Election Law § 296. More particularly, these statutes reflect a consensus of the states that it is permissible for a "temporary" appointee to hold office until the next regular congressional election before which there remains sufficient time to nominate candidates and conduct a campaign.

In the three years following the ratification of the Seventeenth Amendment, 1913 through 1915, 40 states passed statutes regulating the timing of Senate

Amendment there is no comma between the word "election" and the phrase "as the legislature may direct." Plaintiffs claim that the presence of this comma in Tucker's draft shows that the last phrase of the provision was intended to refer only to the temporary appointment authorization, and not to "election."

But the plaintiffs main argument centers on the portion of Tucker's draft, struck from the Amendment on the floor of the Senate in 1912, which would have given exclusive control over the timing of Senatorial elections to the states. Plaintiffs urge that Tucker could not have had in mind the repetitious purpose of again giving the legislatures control over the timing of vacancy elections in this second paragraph. Therefore in order to avoid reading "as the legislature may direct" in a sensible, non-repetitive manner, plaintiffs say we must construe it as applying only to the Governor's temporary appointment power.

It is sufficient to say that plaintiffs' interpretation of the 1892 proposed amendment is argumentative at best; perhaps Tucker wanted to reemphasize the control of the states in the special case of vacancy elections. Moreover, it is clear that Representative Tucker himself believed that his vacancy provision gave to the legislatures some discretion concerning the timing of vacancy elections. See note 21, infra.

We do not venture an opinion whether Tucker's comma was lost through an act of commission or neglect.

8. Appendix A to this opinion presents in tabular form the original and current laws of the state concerning the timing of Senate vacancy elections. Appendix B contains the citations to the original and current Senate vacancy statutes of the 50 states.

vacancy elections, and in most instances authorizing the governor to make a temporary appointment until the election was held. As Table I shows, 23 of these 40

## TABLE I

### MAXIMUM PERIOD OF DELAY AUTHORIZED BY SENATE VACANCY STATUTES [a] BETWEEN OCCURRENCE OF VACANCY AND THE VACANCY ELECTION

| Timing of Vacancy Election | Maximum Delay Authorized Before Election | Number of States Having Provision in: | |
|---|---|---|---|
| | | 1915 [b] | 1968 [c] |
| Special Election by Order of Governor | No specific authorization of delay | 2 | 0 |
| Special Election within one year of creation of vacancy | One year | 9 | 5 |
| Next annual ("general" or "municipal") election | One year, plus time for nominations [d] | 4 | 3 |
| Next biennial ("general", "congressional", "regular" or "state") election | Two years, plus time for nominations | 23 | 40 |
| | | 38 | 48 |
| States with laws requiring election within approximately one year of creation of vacancy | | 15 | 8 |
| States with laws allowing interval of approximately two years or more before election | | 23 | 40 |

a. See appendix A for classification of each state; see appendix B for statutory citations.
b. The statutes of Missouri and Oregon in force in 1915 are not classified because of the vagueness of their provisions.
c. The Missouri statute in force in 1968 is not classified because of its vagueness. Oklahoma has no vacancy statute currently in force.
d. See Table II, infra, for time interval required for nomination procedures by the state statutes.

states provided that a vacancy in the Senate be filled at the next regular biennial statewide election at which it was practical to do so. The precise wording used in these statutes varied slightly. In most the date was described as the next "general" election; in others it was termed the next "congressional" election; and in still others the description next "state" or simply "regular" election was used. But the effect of all of these terms was the same as that resulting from the

requirement of New York's § 296 that vacancy elections be held only in "even-numbered" years: a delay of two years could occur before a Senatorial vacancy was filled by the voters at an election.

■ It is true that 13 of the states which acted between 1913 and 1915, including New York, Laws 1913, ch. 822, did pass statutes which required that an election be held within approximately one year from the occurrence of a vacancy; two more provided that a special election should be held but specified no date. But the fact that these legislatures chose to provide for vacancy elections within approximately one year cannot be taken as proof that they believed themselves without power under the Seventeenth Amendment to authorize that a longer interval occur before the election.

In the years since 1913 the states, in light of their experience in filling Senatorial vacancies, have taken a more liberal view of their power under the Amendment; many more states now require that Senatorial vacancy elections be held only in conjunction with the biennial congressional elections. Thus today the statutes of 40 states in effect establish such a policy; only eight states require that an election be held within approximately one year after a vacancy has arisen.[9]

■ While this impressive coincidence of contemporaneous interpretation and subsequent practice among the states is not sufficient alone to resolve this case, there is ample authority for relying on this evidence as one persuasive guide to constitutional construction.

In McPherson v. Blacker, 146 U.S. 1, 13 S.Ct. 3, 36 L.Ed. 869 (1892), a Michigan statute providing for the election by district of presidential electors was challenged as violating Article II, § 1, cl. 2 of the Constitution which provides:

"Each State shall appoint, in such Manner *as the Legislature thereof may direct,* a Number of Electors equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress * * *." (emphasis added)

A unanimous Supreme Court upheld the statute, placing great emphasis on the widely varying state legislation contemporaneous with, and subsequent to, the ratification of the Constitution. This "practical interpretation," the Court felt, supported viewing the clause in question as granting broad discretion to state legislatures regarding the manner of choosing electors. The Court made this comment:

"The framers of the constitution employed words in their natural sense; and, where they are plain and clear, resort to collateral aids to interpretation is unnecessary, and cannot be indulged in to narrow or enlarge the text; but where there is ambiguity or doubt, or where two views may well be entertained, contemporaneous and subsequent practical construction is entitled to the greatest weight. Certainly, plaintiffs in error cannot reasonably assert that the clause of the Constitution under consideration so plainly sustains their position as to entitle them to object that contemporaneous history and practical construction are not to be allowed their legitimate force, and, conceding that their argument inspires a doubt sufficient to justify resort to the aids of interpretation thus afforded, we are of opinion that such doubt is thereby resolved against them, the contemporaneous practical exposition of the constitution being too strong and obstinate to be shaken or controlled. Stuart v. Laird, 1 Cranch, 299, 309 [2 L.Ed. 115]." 146 U.S. at 27, 13 S.Ct. at 7.

Of similar import is Smiley v. Holm, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795 (1932):

"The practical construction of article 1, § 4 [relating to the state's pow-

---

9. No attempt is made to classify the ambiguous current vacancy statute of Missouri, although it apparently does not require special elections. Oklahoma has no vacancy statute currently in force. See Appendix B for exact citations.

er to set the time, place, and manner of holding Congressional elections], is impressive. *General acquiescence cannot justify departure from the law, but long and continuous interpretation in the course of official action under the law may aid in removing doubts as to its meaning. This is especially true in the case of constitutional provisions governing the exercise of political rights, and hence subject to constant and careful scrutiny.* Certainly, the terms of the constitutional provision furnish no such clear and definite support for a contrary construction as to justify disregard of the established practice in the states." 285 U.S. at 369, 52 S.Ct. at 400. (emphasis added)

See Cooley v. Board of Wardens, 12 How. 299, 53 U.S. 299, 314–315, 13 L.Ed. 996 (1852); cf. Ray v. Blair, 343 U.S. 214, 229–230, 72 S.Ct. 654, 96 L.Ed. 894 (1952).[10]

There is little doubt that the problem of holding Senate vacancy elections has been subjected, in the phrase of Smiley v. Holm, to "careful scrutiny" by the states. There were 156 temporary appointments to the Senate in the years from 1913 to 1967.[11] That in the light of this experience more and more states have chosen to adopt vacancy statutes similar to § 296 provides a firm basis for the conclusion that substantial state interests are furthered by the formula which New York has adopted. It should be noted that not until 1949 did New York experience the necessity, under its previous statute, of holding elections for the same Senate seat in two successive years. This probably explains why New York did not adopt the prevailing form

of vacancy statute—deferring the election until the next congressional election —until 1951.

We find that there are at least three substantial state interests which are furthered by the requirement of § 296 that Senate vacancy elections be held only in "even-numbered" years. It is in those years, when either a United States President or a Governor of New York is elected, and when all the members of the House of Representatives are elected, that voter interest and turnout are at a maximum; this is obviously a more desirable time to fill as important an office as United States Senator. The New York "general" elections in odd-numbered years in fact are dominated by local county and city elections; the only statewide elections concern the often uncontested positions on the New York Court of Appeals and occasional proposals to amend the state constitution. The legislature might reasonably have concluded that local elections should be preserved from the more party-oriented political currents generated by statewide or national contests.

Moreover, it would be considerably more difficult for Senate candidates to finance a campaign in an off-year; they must carry most of the burden themselves since the party organizations do not usually collect funds in such years to conduct campaigns regarding national issues. Of course, the greater use of television in recent campaigns places those candidates unable to raise large sums of money at a great disadvantage, particularly in New York with over 3,000,000 registered voters, many of whom could not be

---

10. These cases should be compared with the recent Supreme Court decision in Williams v. Rhodes, 393 U.S. 23, 89 S. Ct. 5, 21 L.Ed.2d 24 (Oct. 15, 1968). There the statutes of 42 states were squarely contrary to the provisions of the Ohio law invalidated under the equal protection clause. Id. 89 S.Ct. at 12, n. 9. The Court also noted that the experience of other states under their statutes tended to refute the justification presented by Ohio for its law. Id. 89 S.Ct. at 5.

11. Senate Manual, S.Doc.No.1, 90th Cong., 1st Sess. 715 (1967) [hereinafter cited as Senate Manual]. The vacancies and appointments occurring between 1919 and 1964 are listed in Clem, Popular Representation and Senate Vacancies, Midwest Journal of Political Science, Feb. 1966, 52, 58–65. This article contains a helpful background discussion of the Senate vacancy problem.

effectively contacted by any other means. Finally, the experience of New York under its previous vacancy law with successive Senatorial elections in 1949 and 1950,[12] apparently gave rise to the conclusion that the inconvenience and expense to the state of this procedure outweighed any advantages to be derived from having a more prompt vacancy election than is now required by § 296.

We believe that it was to allow the different states to take account of considerations such as these that the vacancy provision of the Amendment granted to the legislatures an area of discretion.

While we have seen that a clear concensus has developed among the states concerning the appropriateness of conducting vacancy elections only in congressional election years, no such consensus is reflected in the provisions governing the time which must elapse between the occurrence of the vacancy and the election at which it is filled. As Table II below indicates, seven of the 40 laws passed from 1913 to 1915

## TABLE II

### MINIMUM PERIOD OF DELAY REQUIRED BY SENATE VACANCY STATUTES [a] BETWEEN OCCURRENCE OF VACANCY AND THE VACANCY ELECTION

| Minimum Delay Required | Number of States With This Requirement in: | |
|---|---|---|
| | 1915 | 1968 |
| No specific requirement | 33 | 27 |
| 1–89 days | 4 | 8 |
| 90–180 days | 2 | 6 |
| Period between primary and election, plus 40–70 days | 1 | 8 |
| | 40 | 49 [b] |

a. See appendix A for classification given to each state; see appendix B for citations to state statutes. All states having vacancy statutes are included in this table.
b. Oklahoma has no vacancy statute currently in force.

explicitly required that some period intervene between the creation of a vacancy and the holding of an election to fill it. The obvious purpose of these provisions was to allow time for the party nominees to be selected and for a campaign to be conducted by the nominees. Only one statute, that of Pennsylvania, specifically provided that the candidates were to be selected through a primary procedure. Although none of the early statutes required a delay as long as the seven month period which must now intervene under § 296 between the occurrence of a vacancy and an election to fill it, a few provided for delays of almost this length. Ohio Laws 1914, House Bill No. 3 (180 days);

12. Under the original 1913 vacancy provision in New York an election was held in November, 1949, to fill the seat left vacant by the resignation of Senator Robert F. Wagner on June 28, 1949; Herbert Lehman defeated John Foster Dulles, whom Governor Dewey had appointed to the post on July 7, 1949. In 1950 another election was held since Senator Wagner's original term was about to expire; Senator Lehman defeated Joe R. Hanley.

The Wagner vacancy was the first to occur in New York which resulted in an "off year" vacancy election. The vacancy created by the death of Senator Copeland on June 17, 1937, was filled at the November 1938 general election. See Clem, supra, note 11, at 60.

Mich.Laws 1915, No. 156 (120 days). Moreover, the wide variation in the provisions of these statutes reflects an interpretation of the Amendment which would allow the states a liberal degree of discretion concerning the procedures to be used in the selection of candidates for Senate vacancy elections.

The diversity among these provisions has continued to the present. See Table II. Most states still do not specifically provide for a delay between the vacancy and the election, although surely the need for at least some delay to allow for the nomination of candidates is implicit in all of the statutes. The current vacancy statutes of 22 states require that there be some interval before the election is held. The intervals required by the laws of four states exceed the interval which has occurred here under § 296 between the occurrence of the Kennedy vacancy and the November, 1968 election. Me. Rev.Stat.Ann. tit. 21, §§ 1531, 448 (1964–65) (60 days prior to June primary); Ohio Rev.Code Ann. § 3521.02 (Baldwin 1968) (180 days); Wis.Stat.Ann. § 17.18 (Supp. 1968) (60 days prior to July primary); see So.Dak.Code §§ 16.0602 (1939), 16.0202 (Supp. 1960) (sufficient time before June primary) (by implication). In eight states,[13] including New York, the interval is for the purpose of conducting a primary.

■■■ We do not believe it a matter of constitutional significance that the delay before the election required under § 296 is a few months longer than is required by most other states due to New York's decision to conduct a primary, and to hold it in June. We interpret the Seventeenth Amendment, as have most of the state legislatures, to allow the states to conduct Senate vacancy elections in accordance with their regular election procedures, so long as those procedures further substantial state interests.

■■■ New York's decision to require candidates for a vacancy election to be selected subject to a direct primary is supported by policy considerations even more compelling than those which justify the prohibition of vacancy elections in "off-years."

New York did not have a direct primary election for statewide candidates, including Senators, until 1967. Laws 1967, ch. 716, § 2; Election Law § 131 (McKinney Supp. 1968). Prior to this law the people voted only for delegates to their party's nominating convention, and the convention nominated the candidates. There was recurrent public debate over whether this procedure resulted in "boss" dominated conventions,[14] and the 1967 statute was the culmination of recurrent efforts to provide some means of challenging the convention's nominee at the polls. Under the law a meeting of each party's state committee selects a candidate, but this choice may be challenged in the June primary by anyone receiving at least 25% of the delegate votes cast on any ballot at the committee meeting, Election Law § 131(3) (Supp. 1968), or by anyone who is able to gather supporting signatures from at least 5%, or 10,000, of the party's enrolled voters. Election Law § 136(2) (a) (Supp. 1968). In 1968 the Democratic Party's voters selected at the primary the candidate who had gotten on the ballot through the

13. Hawaii, Maine, Maryland, Massachusetts, Minnesota, New York, Wisconsin, Wyoming. South Dakota has such a requirement by implication; see Appendix B. Both Maine and South Dakota, like New York, hold their primaries in June. See Appendix B for citations. See Appendix B for statutory citations.

Although we have not been able to research thoroughly this point, it appears that every state with the exception of Indiana now has some general system of direct primary elections. See N. Y. Times, July 23, 1965, p. 32, col. 5. It is very likely that several of the states which require that a specific interval occur between a vacancy and an election, see Table II in text, do so for the purpose of enabling candidates for the vacancy to be selected through the regular primary procedure.

14. See, e.g., N. Y. Times, July 23, 1965, p. 32, col. 5.

signature petition method,[15] rather than the candidate who had received the designation of the party's state committee.

■ If we had ruled that the need for a prompt election in 1968, or shortly thereafter,[16] outweighed the state's interest in conducting a primary, the nominees for the vacancy would have had to have been selected by the few hundred members of the state committee of each party, rather than by the several million enrolled party members. Election Law, § 131(7). The choice, then, is between securing a prompt decision by the people between the nominated candidates, and delaying that decision in order for the people to participate directly in the nominating process. We believe, and hold that the drafters and ratifiers of the Seventeenth Amendment believed, that this type of choice between election procedures is best left to the discretion of the states when there are substantial interests which will be served by either alternative.

■ The Attorney General has advanced three reasons in support of the Legislature's decision in 1965 to change the date of the primary from the "seventh Tuesday before the general election," Election Law § 191(1) (a) (1964), to the "third Tuesday in June before the general election." Laws 1965, ch. 1070, effective Jan. 1, 1966. First, it was thought that voter participation would be greater if the primary was held in the spring, rather than in the fall within two months of the date when the voters must turn out again for the general election. Second, the fact that additional time in which to conduct a campaign would remain after the nominees had been selected was regarded as beneficial to both parties, and in particular to candidates campaigning against an incumbent. Finally, under the previous law it was found that the state Court of Appeals was forced to sit specially al-

most until Election Day in order to rule on challenges stemming from the fall primary. See Stenographer's Minutes of Oral Argument at 58–59. We do not find expressed or implied in the Seventeenth Amendment a policy which so clearly favors prompt vacancy elections that this court should second-guess the decision of the legislature to apply its spring primary system in the case of Senate vacancies in order to further these substantial state interests.

Plaintiffs make several contentions in attempting to establish the unconstitutionality of § 296 despite the wording of the Seventeenth Amendment, the interpretation given to the Amendment by most state legislatures, and the substantial state interests which are furthered by the law. We have examined each of these contentions with great care, mindful that no court has previously construed the Amendment's vacancy provision. In the end we find that none of plaintiffs' arguments offset the impressive showing made in favor of the constitutionality of § 296.

Plaintiffs base their argument that § 296 exceeds the discretion conferred by the Seventeenth Amendment largely on two asserted analogies to the Amendment's vacancy provision. One analogy proceeds from the vacancy provision applicable to the House of Representatives and the other from the portion of the original Constitution superseded by the Amendment. We do not find either of these analogies persuasive.

Plaintiffs point out that the first portion of the Seventeenth Amendment's vacancy provision, stating that in the event of a vacancy the governor "shall issue writs of election to fill such vacancies" is modeled on Art. I, § 2, cl. 4 of the Constitution, which deals with vacancies in the House of Representatives. Plaintiffs argue that the House clause requires the governor to call a prompt elec-

---

15. Paul O'Dwyer defeated Eugene Nickerson, the nominee designated by the party convention, and Rep. Joseph Resnick, who achieved a position on the ballot by vir-

tue of having received over 25% of the ballots cast at the convention.

16. See note 6, supra.

tion to fill a vacancy,[17] and conclude that the similar language in the Seventeenth Amendment must also be interpreted as mandating prompt elections.

Initially, it is not clear that Art. I, § 2, cl. 4 does require the governor to call a prompt election. Clearly he must issue a writ of election, but a few states have interpreted this clause to leave the timing of the election within the governor's discretion. See Ariz.Rev.Stat.Ann. § 16–704 (1956); Del.Code tit. 15, § 7302 (1953); N.Mex.Stat.Ann. § 3–10–20 (1953); Utah Code Ann. § 20–1–5 (1953); Wisc.Stat.Ann. § 8.50 (1967).

But assuming that special elections are required by Art. I, § 2, there are important factors which vitiate the relevance of the House vacancy provision to our problem. That provision, unlike the Seventeenth Amendment, does not authorize temporary appointments. The framers of the Amendment might logically have concluded that prompt elections were less essential for vacancies occurring in the Senate than in the House since a state will be represented in the Senate by the Governor's temporary appointee until an election is held. Furthermore, the state almost always will be represented by its other elected Senator during the existence of any vacancy, while in contrast a vacancy in the House of Representatives leaves the affected district's residents completely without representation in the House until an election.

An important practical consideration also distinguishes the instance of a House vacancy from one occurring in the Senate. It is much easier for both the state government and the political parties to organize and conduct a special election in a single House district than to conduct one covering a populous state such as New York. In New York the problems of administering an election, financing a campaign, and familiarizing the electorate with the candidates are multiplied roughly 41 times in a state-wide election as opposed to an election held in one of the state's 41 House districts. This fact supports the decision of the legislature not to hold special elections to fill Senate vacancies. It also provides another logical explanation for the apparent intent of the drafters of the Seventeenth Amendment to place decisions concerning the conduct of vacancy elections largely in the hands of the various state legislatures; what might be a perfectly feasible procedure in a small state such as Delaware might prove unworkable in a populous state like New York, or a vast state like Alaska.

All of these reasons persuade us that the House vacancy provision can give us no aid in construing the Seventeenth Amendment.

There is a bit more substance in plaintiffs' analogy from the clause of the Constitution which was superseded by the Seventeenth Amendment. The Constitution originally provided for the selection of Senators by the respective state legislatures. Art. I, § 3, cl. 1. Clause 2 of this section provided in these terms for the filling of vacancies:

> [I]f Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies. Art. I, § 3, cl. 2.

At the time the Constitution was ratified it was customary for the state legislatures to meet at least once a year. See A Collection of the Thirteen United States of North-America (1783) (published by order of Congress); The American's Guide (1839) (compilation of state constitutions). See generally Dealey, Growth of American State Constitutions (1915). Consequently, in practice a "temporary" appointee named under the authority granted by Art. I,

---

**17.** New York Election Law § 143(13) provides that if a House vacancy arises before September twentieth of any year it shall be filled at the November election in that year.

§ 3, normally would hold office for no longer than one year, the maximum interval between the adjournment of the legislature and the convening of its "next Meeting." An excerpt from the debates of the Constitutional Convention indicates that this was the understanding of at least two of the Founding Fathers.[18]

The clear purpose of the Seventeenth Amendment was to give effect to the direct voice of the people in the selection of Senators. See, e. g., Sen.Rep.No.961, 61st Cong., 1st Sess. (1911). Starting from this premise, plaintiffs argue that the Amendment should be construed to prohibit delays in the holding of vacancy elections which materially exceed the approximate one year limit established under Art. I, § 3. They contend that it would be incongruous to construe an Amendment which embodies the principle of popular sovereignty as countenancing the delay of 29 months mandated by § 296 in this case, a delay more than twice as long as was the custom which plaintiffs contend prevailed before the adoption of the Amendment.

However, our research reveals that by 1913 there was in fact no settled custom under Art. I, § 3 to limit vacancy appointments to one year. As early as 1814 an appointment is recorded which extended for approximately 19 months.[19] Toward the end of the Nineteenth Century more and more state legislatures began to meet only in alternate years, with the result that a period of almost two years could intervene between the occurrence of a Senate vacancy and the "next meeting" of the legislature. Between 1789 and 1913 there were 179 Senatorial appointments; 32 of these appointees served for more than one year and 17 of these served for at least 14 months.[20] Thus while a heavy preponderance of appointments prior to 1913 did not extend beyond one year, it can-

---

18. Madison's Notes on the debates report this exchange and vote concerning the provision for temporary appointments to the Senate by the state executives:

"Mr. Wilson objected to vacancies in the Senate being supplied by the Executive of the States. It was unnecessary as the Legislatures will meet so frequently. It removes the appointment too far from the people: the Executive in most of the States being elected by the Legislatures. As he had always thought the appointment of the Executives by the Legislative department wrong, so it was still more so that the Executive should elect into the Legislative department.

Mr. Randolph thought it necessary (in order) to prevent inconvenient chasms in the Senate. *In some States the Legislatures meet but once a year.* As the Senate will have more power, and consist of a smaller number than the other House, vacancies there will be of more consequence. *The Executives might safely be trusted (he thought with the appointment for so short a time.)* (Emphasis supplied)

 * * * * *

On the question for striking out "vacancies shall be supplied by Executives"

 * * * * *

2 Farrand, The Records of the Federal Convention of 1787 at 231 (Madison's notes) (rev. ed. 1966).

19. Senator Jesse Wharton of Tennessee was appointed to the Senate on March 17, 1814, and this appointment extended until October 10, 1815. Senate Manual 715.

20. The foregoing information was abstracted from the Senate Manual, supra at 661–725. See also, I Haynes, The Senate of the United States 161–66 (1960), whose figures differ, but are reconcilable, in details which are not significant here. The longest appointment was that of Senator Robert Wilson of Missouri who served for 22 months, from January 17, 1862, to November 13, 1863. Senate Manual, supra at 694. The appointment in this case will extend for a period of slightly less than 26 months.

The Senate Manual mistakenly indicates that Alfred O. P. Nicholson of Tennessee served by appointment from December 25, 1840, to October 16, 1843. Id. at 715. The appointment actually lasted until February 7, 1842. See Congressional Directory, 27th Cong., 2d Sess. 22 (1841–42); Biographical Directory of the American Congress, H.Doc. No. 442, 85th Cong., 2d Sess. 1389 (1961).

not be said that at the time the Seventeenth Amendment was proposed an appointment for a longer period was regarded as impermissible. It is apparent that Art. I, § 3, was never interpreted to require that a special session of the legislature be convened to fill a Senate vacancy promptly after it arose. This fact provides no support for plaintiffs' contention that special elections are required to fill vacancies under the Seventeenth Amendment.

Even if there had been a consistent practice prior to 1913 to limit temporary appointments to approximately one year, our ultimate decision here would be no different. There is very little evidence from the legislative history of the Seventeenth Amendment that the Congress and state legislatures which adopted it regarded the phrase "temporary appointments" as possessing a meaning derived from the practical experience under Art. I, § 3.

It is true that Representative Tucker of Virginia, who in 1892 drafted and first introduced the vacancy provision ultimately ratified as part of the Seventeenth Amendment, regarded a one year limit on the length of temporary appointments as implicit in his proposed provision.[21] In addition, one brief reference to the vacancy provision by Senator Bristow during the 1911 Senate debate over the Amendment[22] supports

---

21. Representative Tucker provided the House with this interpretation of his vacancy provision:

"Where vacancies occur the executive of the State shall direct writs to issue for holding the election by the people to fill the vacancies; or by law, the legislature may empower the executive to fill the same temporarily until an election can be had.

Under this clause the governor must order an election to fill the vacancy that has occurred. This preserves the principle of election by the people. In some states, however, in which there are annual elections, this would be a hardship, for the vacancy would in most cases not be of long duration, and to add another State election would be imposing an unnecessary expense on the people, so that the proviso was thought to be wise by which the governor may be empowered to fill the vacancy "until the people fill the vacancy by election, as the legislature may direct."

Under this provision in a State where there are biennial elections the legislature might direct that if a vacancy occurred within a year [or any other period it might fix] after the election, the vacancy should be filled by an election by the people; but if the vacancy occurred more than a year after the election the vacancy should be filled by executive appointment. This optional feature in the filling of vacancies was as far as your committee deemed it prudent to go in this direction."

H.R.Rep. No. 368, 52d. Cong., 1st Sess. 5 (1892).

22. In offering the Amendment to the Senate in 1911 Senator Bristow made these remarks:

"The only other change that is proposed to be made in the Constitution as it is now is a provision for the filling of vacancies. The Constitution as it now reads, referring to vacancies in the Senate, says:

'And if vacancies happen by resignation or otherwise, during the recess of the legislature of any State, the executive thereof may make temporary appointments until the next meeting of the legislature, which shall then fill such vacancies.'

"Instead of that, I provide the following:

'When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies.'

"Which is exactly the language used in providing for the filling of vacancies which occur in the House of Representatives, with the exception that the word 'of' is used in the first line for the word 'from,' which, however, makes no material difference.

"Then my substitute provides that—

'The legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.'

"That is practically the same provision which now exists in the case of such a vacancy. The governor of the State may appoint a Senator until the

plaintiffs' position in this case. But these two isolated statements fall far short of establishing that the Congress which approved the Amendment in 1912 adopted an interpretation of it contrary to New York's § 296. We do not find these bits of legislative history persuasive when weighed against the substantial state interests furthered by § 296, interests which have led most of the states to adopt similar statutes postponing vacancy elections until the next regular congressional election.

Little weight can be given to Representative Tucker's 1892 interpretation of his vacancy provision since there is no indication that the Congress which proposed the Seventeenth Amendment was even cognizant of his opinion. In the period from 1892 to 1912 many alternative vacancy provisions were placed before Congress as part of proposed amendments which failed of passage. Several of these provisions [23] specifically incorporated language concerning the timing of vacancy elections which is roughly similar to the interpretation of the Seventeenth Amendment urged on us by the Attorney General. At least one of the proposals [24] reached a result very close to the one contended for by the plaintiffs in this suit. No inference one way or the other can be drawn from the fact that none of these conflicting specific proposals was adopted.

There is no direct evidence revealing the reason for the ultimate return in 1912 to the vacancy provision contained in Tucker's original draft. However, it appears that the Tucker draft became the focus of attention not because of its vacancy provision, but because it included a clause which would have vested in the states exclusive control over the "Times, Places, and Manner of holding Elections for Senators." This repeal of the residual federal power over Senate elections contained in the original Constitution, Art. I, § 4, cl. 1, was sought by southern Senators as the price for their support of the principle of popular elections. See Bristow, Resolution for the Direct Election of Senators (1912) (Senate Doc. 666, 62d Cong., 2d Sess.). While this clause was struck from the Amendment before its final passage, this history possibly explains the presence of the Tucker vacancy provision in the Seventeenth Amendment. It does not seem that this provision was discussed in the 1911–12 congressional debates over the Amendment with the exception of the one brief reference by Senator Bristow noted previously. See note 22 supra. The attention of the Senate was focused in particular on the southern attempt to achieve state control over the conduct of Senate elections and, of course, on the basic issue of popular elections.

 We must conclude, therefore, that the legislative history of the Amendment sheds little light on the interpretation of the vacancy provision and does not sustain plaintiffs' contentions in this case. We read the Amendment to confer a reasonable discretion upon the states concerning the timing and manner of conducting vacancy elections. We hold that New York Election Law § 296, passed in response to the state's actual experience in these matters, is a permissible exercise of that discretion because it furthers important

---

legislature elects. My amendment provides that the legislature may empower the governor of the State to appoint a Senator to fill a vacancy until the election occurs, and he is directed by this amendment to 'issue writs of election to fill such vacancies.'

"That is, I used exactly the same language in directing the governor to call special elections for the election of Senators to fill vacancies that is used in the Constitution in directing him to issue writs of election to fill vacancies in the House of Representatives." 47 Cong.Rec. 1482–83 (1911).

23. See, e. g., Sen.Rep. No. 916, 53d Cong., 3d Sess. 1 (1895) (setting election at "the next general election for members of the House of Representatives * * *).

24. H.R.Rep. No. 368, 52d Cong., 1st Sess., pt. 2, p. 1 (1892) (vacancy to be filled whenever "an election can be held for the rest of the term").

interests of the state and is in substantial agreement with both the original and current interpretation of the Seventeenth Amendment adopted by most state legislatures.

Our dissenting brother finds decisive in his resolution of this case such Supreme Court decisions as Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). These are instances, it is true, where the Supreme Court adopted an interpretation of a constitutional amendment contrary to the laws passed by many states soon after they ratified the Amendment. See also Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). We do not assert, of course, that contemporaneous state statutes always constitute persuasive authority for the constitutional interpretation which they incorporate. But *Baker* and *Brown* are far removed from the circumstances of this case. Both interpreted the equal protection clause of the Fourteenth Amendment, a provision which restricts ("No state shall * * * deny") rather than confers ("as the legislature may direct") state discretion. In both cases the need for innovative judicial intervention was at a maximum for the political process had consigned a minority of a state's citizens to a permanent position of inferiority with no real hope of legislative redress. Cf. Hobson v. Hansen, 269 F.Supp. 401, 506–508 (D.D.C.1967). Also in this category is Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (Oct. 15, 1968), where the laws of Ohio, if left undisturbed, stood as a continuing barrier to the practical ability of minority political parties to gain a place on the state's ballot.[25]

In this case we are confronted with no fundamental imperfection in the functioning of democracy. No political party or portion of the state's citizens can claim that it is permanently disadvantaged by § 296, or that it lacks effective means of securing legislative reform if the statute is regarded as unsatisfactory. We have, rather, only the unusual, temporary, and unfortunate combination of a tragic event and a reasonable statutory scheme.

New York's Legislature has seen fit, in the light of experience and changing conditions, to provide that senatorial vacancies be filled by an election to be held when the people are also electing their representatives to the House. The Legislature has also provided that opportunity be given to select the candidate for Senator at party primaries, and has decided to hold primaries in June, instead of September. One of the goals served by these changes in the state's law is to maximize voter participation in the nomination and election of Senators, even though as a consequence the holding of elections is somewhat delayed. Forty states have exercised their discretion under the Seventeenth Amendment in a manner consistent with one or more of the provisions of § 296.

■ We are aware of the importance of the right to vote in this country's general scheme of constitutional government. See Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L.Ed.2d 24 (Oct. 15, 1968). We are also aware of the basic principle of federalism which requires that a federal court exercise great caution before striking down a state statute as repugnant to the Constitution. As there are substantial state interests furthered by each of these changes affected by § 296 in the timetable for filling senate vacancies by election, and as the Seventeenth Amendment has specifically given to the legislatures of the states power to regulate vacancy elections, it is not for a federal court to substitute its own judgment for that of the elected representatives of the people. The lessons of history and the accumulating judgments of the states in the light of experience support our conclusion that the laws of New York do not contravene the powers which the

---

25. And see note 10, supra.

Constitution has given to the state legislatures, although in the tragic circumstances of Senator Kennedy's death the statutory chronology results in a delay of 29 months before the election of his successor by the people.

The complaints are dismissed.

Duplicate originals of this opinion are being filed in the Western District of New York and in the Southern District of New York.

## APPENDIX A

Original and Current Senate Vacancy Statutes of the Fifty States [1]

| State | Vote on Ratification of 17th Amendment | Date of First Vacancy Statute | Election at Governor's Discretion | Special Election Within A Year | Vacancy Filled at Next Annual Election | Vacancy Filled at Next Biennial Election with No Specified Period for Nomination | Vacancy Filled at Next Biennial Election Preceded by a Specified Period of Less than 90 days | Vacancy Filled at Next Biennial Election Preceded by a Specified Period of 90 Days or more | Vacancy Filled at Next Biennial Election Preceded by a Period for the Specific Purpose of Conducting a Primary |
|---|---|---|---|---|---|---|---|---|---|
| Ala. | no vote | 1915 | | O, C² | | | | | |
| Alaska | no vote | 1960 | | | | | | O, C | |
| Ariz. | yes | 1913 | | | | O, C | | C | |
| Ark. | yes | 1917 | | O | | | | | |
| Calif. | yes | 1913 | | | | O, C | | | |
| Col. | yes | 1913 | O | | O | | | | |
| Conn. | yes | 1913 | | O | | | | | |
| Del. | no vote | 1915 | | | | | C | | |
| Fla. | no vote | 1913 | | | | C | | | |
| Ga. | no vote | 1913 | | | | O, C | | | |
| Hawaii | no vote | 1961 | | | | | | | O, C |
| Idaho | yes | 1917 | | | | | O, C | | |
| Ill. | yes | 1913 | | | | O, C | | | |
| Ind. | yes | 1915 | | | | O, C | | | |
| Iowa | yes | 1917 | | | | O, C | | | |
| Kansas | yes | 1927 | | | | O, C | | | |
| Ky. | no vote | 1914 | | O, C | | | | | |
| La. | yes | 1915 | | O | | O, C | | | |
| Me. | yes | 1915 | | | | | | | |
| Md. | no vote | 1914 | O | | O | | | | |
| Mass. | yes | 1913 | | | | | | | C C C |
| Mich. | yes | 1915 | | | | | | | C |
| Minn. | yes | 1913 | | | | O | | O, C | |
| Miss. | no vote | 1914 | | O, C | | | | | C |
| Mo.³ | yes | 1915 | | | | | | | |

1. Citations are listed in Appendix B.
2. The original statute is designated by an O and the current statute is designated by a C.
3. Missouri is not classified because of the vagueness of its statute. See Appendix B for statutory language.

## APPENDIX A—Continued

### Original and Current Senate Vacancy Statutes of the Fifty States—Continued

| State | Vote on Ratification of 17th Amendment | Date of First Vacancy Statute | Election at Governor's Discretion | Special Election Within A Year | Vacancy Filled at Next Annual Election | Vacancy Filled at Next Biennial Election with No Specified Period for Nomination | Vacancy Filled at Next Biennial Election Preceded by a Specified Period of Less than 90 days | Vacancy Filled at Next Biennial Election Preceded by a Specified Period of 90 Days or more | Vacancy Filled at Next Biennial Election Preceded by a Period for the Specific Purpose of Conducting a Primary |
|---|---|---|---|---|---|---|---|---|---|
| Mont. | yes | 1915 | | | | | | | |
| Neb. | yes | 1917 | | | | | | | |
| Nev. | yes | 1915 | | | | O,C | | | |
| N.H. | yes | 1915 | | | | O,C | | | |
| N.J. | yes | 1920 | | | O,C | | | | |
| N.M. | yes | 1915 | | | | | O,C | | |
| N.Y. | yes | 1913 | | | O | | | | C |
| N.C. | yes | 1913 | | | | O,C | | | |
| N.D. | yes | 1927 | | | | O | | | |
| Ohio | yes | 1914 | | | | | | | |
| Okla.[4] | yes | 1913 | | | | | | O,C | |
| Ore.[5] | yes | 1915 | | | | | C | | |
| Pa. | yes | 1913 | | | C | | | | O |
| R.I. | no vote | 1914 | | OO | | | C | | |
| S.C. | no vote | 1914 | | OO | | | | C | |
| S.D.[6] | yes | 1915 | | | | O,C | | | |

4. Oklahoma repealed its vacancy statute in 1965.
5. Oregon's original statute is not classified because of its vagueness. See Appendix B for statutory language.
6. The current statutory language by implication requires that a primary be held. See Appendix B.

APPENDIX A—Continued

Original and Current Senate Vacancy Statutes of the Fifty States—Continued

| State | Vote on Ratification of 17th Amendment | Date of First Vacancy Statute | Election at Governor's Discretion | Special Election Within A Year | Election Vacancy Filled at Next Annual Election | Vacancy Filled at Next Biennial Election with No Specified Period for Nomination | Vacancy Filled at Next Biennial Election Preceded by a Specified Period of Less than 90 days | Vacancy Filled at Next Biennial Election Preceded by a Specified Period of 90 Days or more | Vacancy Filled at Next Biennial Election Preceded by a Period for the Specific Purpose of Conducting a Primary |
|---|---|---|---|---|---|---|---|---|---|
| Tenn. | yes | 1913 | | | | O, C | | | |
| Texas | yes | 1913 | | O, C | | | | | |
| Utah | rejected | 1915 | | C | | O, C | | | |
| Vt. | yes | 1915 | | | | O | | | |
| Va. | no vote | 1914 | | O | O, C | | | | |
| Wash. | yes | 1915 | | | | C | | | |
| West Va. | yes | 1921 | | | | O, C | | | C |
| Wisc. | yes | 1913 | | | | O | | | C |
| Wyo. | yes | 1913 | | | | O | | | |
| TOTALS: | | | O-2 C-0 | O-10 C-5 | O-5=(17) C-3=(8) | O-22 C-20 | O-4 C-7 | O-3 C-5 | O-2=(31) C-8=(40) |

## APPENDIX B
### Citations to Original and Current*
### Senate Vacancy Statutes of the
### Fifty States

All references to state constitutions affecting the first vacancy statutes are to the constitutions in effect at the time the statute involved was passed.

*Alabama* first provided for a special election if more than four months remained before the general election. Law 1915, No. 410, p. 364.

The present law is similar. Code tit. 41, §§ 166, 167 (1958).

*Alaska* first provided, and now provides, for filling the vacancy at the first general election more than three months after the vacancy; however, the governor's temporary appointee may serve out any unexpired term of 29 months or less. Stat. §§ 15.40.030, 15.40.050 (1962). General elections are held in even numbered years. Stat. § 15.15.020 (1962).

*Arizona* first provided for filling the vacancy at the next general election. If this would have resulted in a lapse of more than six months, the governor had power to call a special election. Rev. Stat., Civ.Code tit. 12, § 2870 (Pattee 1913). General elections were held every even year. Rev.Stat., Civ.Code tit. 12, § 2866 (Pattee 1913).

The present law is identical. Rev.Stat. Ann. §§ 16–722, 16–701 (1956).

*Arkansas* first provided for holding a special election within a year of the occurrence of the vacancy. Acts 1917, No. 402, p. 1869.

Present law provides for filling the vacancy at the first general election more than four months after the vacancy. Const. Amend. XXIX, §§ 1, 4, 5 (1947). General elections are held every two years. Const. Art. III, § 8.

*California* first required filling the vacancy at the next general election, which was held every even year. Stat.

1913, ch. 156, pp. 237, 238 Cal.Polit. Code § 1041 (Deering 1915).

The present statute is identical. Elections Code Ann. §§ 25001, 2500 (Deering 1961).

*Colorado* first required filling the vacancy at the next general election, which was held annually, Laws 1913, ch. 79, p. 267; Const. Art. VII, § 7.

Under current law the general election is held "every even numbered year." Rev.Stat. § 49–2–1 (1964). The vacancy statute is identical to the 1913 law. Rev. Stat. 49–19–2 (1964).

*Connecticut* first required simply that the governor should order an election, apparently at his discretion. Pub.Acts 1913, ch. 219, pp. 1839–1843.

The present law requires filling the vacancy at the first state election held more than 60 days after the vacancy. Gen.Stat.Ann. § 9–211 (1967). State elections are held every even year. Gen. Stat.Ann. § 9–1 (1967).

*Delaware* first provided for a special election if the vacancy occurred more than one year before the next general election. Rev.Code § 1890 (1915).

The present statute provides for the vacancy to be filled at the next biennial general election. Code Ann. tit. 15, § 7321 (1953); Const. Art. V, § 1.

*Florida* first provided for filling the vacancy at the next general election, which was held every even year. Laws 1913, ch. 6471, pp. 277, 278; Const. Art. XVIII, § 9, F.S.A.

The present statute is identical. Stat. Ann. §§ 100.161, 100.031 (1960).

*Georgia* first required vacancies to be filled at the "next election * * * for the Members of Congress." Acts 1913, No. 168, pp. 135, 136.

The current statute is identical. Code Ann. § 34–2403 (1962).

*Hawaii* has always required filling the vacancy at the first general election

---

* These citations are believed accurate, but do not include any recent amendments to vacancy laws which have not yet been incorporated in the supplements to the state statutory codes.

preceded by primary time plus sixty days. Laws 1961, ch. 123, § 1; Rev. Laws 1955, § 11–1.5 (Supp.1965). There is a general election every even year. Const. Art. II, § 5. Primaries are held in October. Rev.Laws 1955, § 11–92.

*Idaho* first required filling the vacancy at the first general election more than 30 days after the vacancy. Laws 1917, ch. 27, pp. 68–69. General elections were held every even year. Compiled Stat. tit. 4, § 491 (1919).

The present statute is identical. Code § 59–910; Code § 34–201 (1947).

*Illinois* first required filling the vacancy at the "next election of representatives in Congress." Laws 1913, S.B. No. 372, pp. 307, 308.

The present statute is identical. Ann. Stat. ch. 46, § 25–8 (Smith-Hurd 1965).

*Indiana* first required filling the vacancy at the "next regular election of state officers," which apparently took place every even year. Acts 1915, ch. 4, pp. 13–14; Laws 1881, ch. 47, § 2.

The present statute is identical. Stat.Ann. §§ 29–4002, 29–4801 (Burns 1949).

*Iowa* first required filling the vacancy at the "next succeeding general election." Acts 1917, ch. 401, p. 430. General elections were held biennially. Compiled Code § 343 (1919).

The present statute requires that the vacancy be filled at the "next regular election at which such vacancy can be filled." Code Ann. § 69.11 (1949). Regular state elections are held biennially. See Code Ann. § 39.1 (1949); Const. art. 12, § 16.

*Kansas* first provided for filling a vacancy at the next election to the House of Representatives. Laws 1927, ch. 204, p. 258.

The present statute is identical. Stat. Ann. § 25–318 (1964).

*Kentucky* first provided for filling vacancies at the next Congressional election. Acts 1914, ch. 25, pp. 98, 99.

The present statute is identical. Rev. Stat. § 63.200 (1959).

*Louisiana* first required the governor to issue a writ within ten days of the occurrence of the vacancy, the election to be held within 90 days thereafter. Acts 1914, No. 241, pp. 471, 472.

The present statute is identical. Stat. Ann. §§ 18:1413; 18:1414 (1950).

*Maine* first required an election before the next session of Congress, or "forthwith" if Congress was in session. Act 1915, ch. 55, pp. 35–36.

The present requirement is for the vacancy to be filled at the first general election preceded at least by the primary plus sixty days. Rev.Stat.Ann. tit. 21, § 1531 (1964). There is a state election every two years. Rev.Stat.Ann. tit. 21, § 1, subd. 14 (1964). The primary is held the third Monday in June. Rev. Stat. Ann. tit. 21, § 448 (1965).

*Maryland* first provided for the vacancy to be filled in the next general election for the state assembly or for members of Congress. Laws 1914, ch. 761. In those days members of the general assembly were elected every odd year. Const. Art. III, § 7.

The present statute uses the formula next "general congressional election." Code Ann. 1967, art. 33, § 22–1 (Supp. 1967); this section provides that the candidates for the vacancy must be selected at the primary preceding this election. Maryland holds its primary in September. Code Ann. art. 33, § 5–2 (Supp.1967).

*Massachusetts* first required the governor to issue a precept to hold an election "on the day appointed therein." Stat. 1913, ch. 835, pt. iv, § 336, p. 1059.

The present requirement is for the vacancy to be filled at the first biennial election whose primary falls more than 70 days after occurrence of the vacancy. Gen.Laws Ann. ch. 54, § 139 (1964). Massachusetts holds its primary on the seventh Tuesday preceding the election. Gen.Laws Ann. ch. 53, § 28 (1964).

*Michigan* first required the vacancy to be filled at the first general election more than 120 days after the occurrence

of the vacancy. Pub.Acts 1915, No. 156, pp. 261, 262. There was a general election every even year. Pub.Acts 1913, No. 56.

The current provisions are identical. Compiled Laws Ann. §§ 168.105; 168.3 (1967).

*Minnesota* first provided for the vacancy to be filled at the next general election, which took place every two years. Laws 1913, ch. 520, § 8, pp. 756–758; Gen.Stat. 1913, ch. 6, § 298.

The present requirement is for the vacancy to be filled at the next biennial state election whose primary falls at least 60 days after occurrence of the vacancy. Stat.Ann § 203.56 (1962). The primary is held in September. Stat.Ann. § 202.02 (1962).

*Mississippi* first required a special election within 90 days unless there was a general election the same year, or unless there was less than one year left in the term. Laws 1914, ch. 148, § 3, pp. 192, 193.

The current statute is identical. Code Ann. §§ 3308, 3309 (1956).

*Missouri* now provides, and has always provided, for executive appointment "until a successor shall have been duly elected and qualified according to law." Ann. Stat. § 105.040 (1966); Laws 1915, S.B. 351, p. 280.

*Montana* first required a vacancy to be filled at the next general election, which was held every even year. Laws 1915, ch. 126, pp. 281, 282; Rev.Code ch. 44, § 531 (1921).

The current statute is identical. Rev. Code §§ 23–2201, 23–2101 (1967).

*Nebraska* first required the vacancy to be filled at the first election for state officers more than 40 days after it occurred, and held such elections in even years. Laws 1917, ch. 39, pp. 117, 118; Laws 1913, ch. 149.

The present statute is identical. Rev. Stat. §§ 32–1042, 32–105 (1960).

*Nevada* first required vacancies to be filled at the next general election, which

was held every two years. Laws 1915, ch. 65 pp. 83–84; Acts 1873, ch. 121.

The present statute is identical. Rev. Stat. § 304.030 (1967).

*New Hampshire* first provided for the vacancy to be filled at the next general election, which was held every even year. Laws 1915, ch. 29, p. 32; Laws 1909, ch. 153.1.

The present statute is identical. Rev. Stat.Ann. § 63.3 (1955).

*New Jersey* first required the vacancy to be filled at the next general election which was more than 30 days after the occurrence of the vacancy, but the governor had discretion to call a special election earlier. There was a general election every year. Laws 1920, ch. 349.

The present statutes are identical. Stat.Ann. §§ 19:3–26, 19:1–1 (1964).

*New Mexico* first required the vacancy to be filled at the first general election at least thirty days after the occurrence of the vacancy. Laws 1915, ch. 27. General elections were held every even year. Const. Art. XX, § 6.

The present statutes are identical. Gen.Stat.Ann. § 3–10–19 (1954).

*New York* first provided that the vacancy be filled at the first annual general election held 30 or more days after the creation of the vacancy. Laws 1913, ch. 822.

The current law provides that the vacancy be filled in the first even-numbered year in which 60 days or more intervene between the creation of the vacancy and the June primary. Election Law §§ 296 (1964), 191(1) (a) (Supp.1968).

*North Carolina* first required the election to be held at the first general election more than 30 days after the vacancy. Laws 1913, ch. 114, p. 206. These elections were held every even year. Laws 1901, ch. 18, § 3.

The present statute requires the vacancy to be filled at the next election for members of the general assembly held more than 30 days after the vacancy occurs. The general assembly is elected in

even-numbered years. Gen.Stat. § 163–12.1 (Supp.1967).

*North Dakota* first provided for the vacancy to be filled "at the next State wide election whether June primary or general election." Laws 1927, ch. 138, pp. 175–76. In every even year there was a primary in June and a general election in November. Laws 1892, H.B. No. 1, § 1.

At present the requirement is for filling of vacancy at the next state-wide election. Century Code Ann. § 16–07–07 (1960). There is still an election in every even-numbered year. Century Code Ann. § 16–06–01 (1960).

*Ohio* first required the vacancy to be filled at the next state election more than 180 days after its occurrence. Laws 1914, H.B. No. 3, p. 8. These elections were held in even numbered years. Laws 1913, p. 23.

The present statutes are essentially similar. Rev.Code Ann. §§ 3521.02, 3501.01(C) (Baldwin 1968).

*Oklahoma* first required the vacancy to be filled at the next primary and general election. Laws 1915, ch. 49, pp. 69–70. These elections were held every two years. Laws 1907–8, S.B. No. 23.

This statute was repealed by Laws 1965, ch. 116, § 4.

*Oregon* first provided that the governor's appointee shall serve until a United States Senator is regularly elected and qualified. Code § 236.130; Laws 1915, ch. 48, p. 59.

Today the vacancy is to be filled at the next general election held more than 20 days after the vacancy occurs. Const. art. V, § 16 (eff. 1926). General elections are held in even-numbered years. Rev.Stat. § 250.010 (1963).

*Pennsylvania* first provided for filling the vacancy at the first general election whose primary occurred more than 60 days after the vacancy. Laws 1913, No. 454. There was a general election every even year. Const. Art. VIII, § 2, P.S.

The present requirement is for the vacancy to be filled "at the next general or municipal election, occurring at least ninety (90) days after the happening of such vacancy." Stat.Ann. tit. 25, § 2776. There is a general election every even-numbered year and a municipal election every odd-numbered year. Stat.Ann. tit. 25, §§ 2751, 2752.

*Rhode Island* first required a special election "at as early a date * * * as will admit of compliance with the provisions of law in relation to such elections". Laws 1914, ch. 1048, § 6.

The present statutes provide for filling the seat at the first general election at least 70 days after the vacancy, and for holding general elections in even-numbered years. Gen.Laws §§ 17–4–9, 17–1–2(b) (1967 Supp.)

*South Carolina* first provided for a special election within 90 days. Laws 1914, ch. 337.

The present statutes provide for general elections in even-numbered years, and require any vacancy to be filled at the first general election more than 100 days after the vacancy. Code Ann. §§ 23–552, 23–391 (1962).

*South Dakota* first provided for filling vacancies at the "next general election," and required these to be held every even-numbered year. Laws 1915, ch. 182; Const. Art. VII, § 4.

The present provision is for filling vacancies at the next general election which is preceded by sufficient time to allow compliance with the regular nominating procedures, which include a primary. Code § 16.0602 (1939). General elections are still held every even-numbered year. Code § 16–0601 (1939). The primary is held the first Tuesday in June. § 16.0202 (Supp.1960).

*Tennessee* first required the vacancy to be filled at the "next regular biennial election." Acts 1913, ch. 8, § 3.

The current statute is identical. Code Ann. § 2–608 (1955).

*Texas* first required a special election within 90 days unless the vacancy occurred within eight months of a general election. Acts 1913, ch. 39.

The current statute is essentially similar. Stat.Ann.Election Code, art. 12.02 (1967), V.A.T.S.

*Utah* first required a choice at the "next regular election to be held in the State of Utah for the Federal House of Representatives." Laws 1915, ch. 48.

The present requirement is for the choice to be made at the next general election, which must be held in an even-numbered year. Code Ann. §§ 20–1–6, 20–1–1 (1953).

*Vermont* first required the vacancy to be filled at the next general election, which took place every even-numbered year. Acts 1915, No. 7; Const. Arts. 35, 36.

The present statute requires the governor to call a special election, but also provides that if the vacancy occurs in a general election year before the general election, it shall be filled then. Stat.Ann. tit. 17, § 1501 (1959).

*Virginia* has always provided for filling vacancies at the next "November election" and for holding these elections annually. Code §§ 24–2, 24–136 (1964); Laws 1914, ch. 150; Laws 1906, ch. 28.

*Washington* first provided only that "the Governor shall issue a writ of election to fill such vacancy, which writ shall fix the time for such election not less than twenty-five days after the issuance thereof." Laws 1915, ch. 60, p. 232. We classify this statute as requiring a special election within one year.

The present statutes require the vacancy to be filled at the next state general election, which is held every even-numbered year. Rev.Code Ann. § 29.68.070 (1965); Const. Art. VI, § 8.

*West Virginia* first provided for filling the vacancy at the next general election, and for holding those elections every year. Laws 1921 ch. 101, § 1; Laws 1891, ch. 89.

Present statutes allow appointment for the balance of the term if that is less than thirty months, and otherwise until the next general election, which is held in even-numbered years. Code §§ 3–10–3, 3–1–31 (Supp.1968).

*Wisconsin* first provided for the vacancy to be filled at the next general election if the governor did not call a special election before then. Laws 1913, ch. 634, § 94k. General elections were held every two years. Const. Art. VI, § 6.

The current statutes require the vacancy to be filled in the next biennial general election year in which the vacancy occurs at least 60 days before the July primary. Code § 17.18 (Supp.1968).

*Wyoming* first provided for filling the vacancy at the next general election, which was held in even years. Laws 1913, ch. 91, § 1; Const. Art. VI, § 18.

Current law provides for filling the vacancy at the first general election whose primary occurs at least 40 days after the vacancy. Stat. § 22–118.188 (Supp.1967). General elections are held in even-numbered years. Stat. § 22–118.3 (Supp.1967). Primaries are held in August. Stat. § 22–118.15 (Supp. 1967).

## DISSENTING OPINION

FRANKEL, District Judge (dissenting):

The loud, clear, and supreme command of the Seventeenth Amendment is that Senators are to be "elected by the people * * *." Though not all change is progress, none of us doubts that this expansion of popular sovereignty was a forward step for a cherished national ideal. But the office of Senator is too important to be left vacant even for brief periods. And so, as a stopgap, in a proviso, the Amendment allows Governors to make "temporary appointments until the people fill the vacancies by election as the legislature may direct." According to the defendants, with the approval of my respected colleagues on this court, that proviso is entitled to so expansive a role that nearly half the senatorial term may be occupied by an appointee rather than by a choice of the people.

This is an unprecedented extension of the "temporary" appointive power. It is sanctioned today in what appears to be the first judicial scrutiny of the pro-

viso in question. The result, I believe, is an error. It is said to rest, initially, upon what my brethren perceive as "cléar language"—namely, the five words ("as the legislature may direct") at the end of the proviso—but the language had a "clear" meaning of a quite different sort to those who wrote it. Bloating that tag-end phrase, the majority's construction follows from an almost total disregard of the Amendment's primary terms and vital sense. Indeed, the majority opinion (like the brief of the State's Attorney General) does not even quote the positive first paragraph of the Seventeenth Amendment, but sets out only the second paragraph, concerning vacancies, in a kind of artificial isolation which may help to account for what I believe to be a plainly misplaced emphasis.

The majority's result is also thought to find support in the unconsidered, untested enactments of some state legislatures, none of which appeared, even on their surface, to go as far as New York's officials now claim a right to go in blocking the popular will. But perhaps the most remarkable thing of all is that the revered principle of government "by the people," so clearly at the heart of the Seventeenth Amendment, is today subordinated when there is no faint echo of any genuinely countervailing interest, state or federal, to be furthered in the process. I say this in full awareness that the majority opinion refers repeatedly to "substantial state interests" as supposed justification for the way New York's authorities have dealt with the Seventeenth Amendment. In the end, however, this array of asserted "interests"—ranging, as I shall explain below, from trivial to merely debatable—amounts to nothing that should be thought to "balance" into a 30-month paralysis the sovereignty of the people proclaimed by the Amendment.

I.

The most powerful, and probably sufficient, arguments against defendants' position are found in the words of the Seventeenth Amendment, in sound and familiar guides to their construction, in the arrangement of those words, and in their constitutional setting, which includes, of course, elementary principles of representative government familiar to all of us. Postponing those central subjects, I note that useful light and perspective are afforded by referring first to the pertinent provisions of the Constitution as they were originally written and as they stood just prior to the changes wrought by the Seventeenth Amendment.

Article I, section 3, clause 1, provided that the Senators from each State were to be "chosen by the legislature thereof * * *." The next succeeding clause, in the portion most pertinent here, said:

"if Vacancies happen by Resignation, or otherwise, during the Recess of the Legislature of any State, the Executive thereof may make temporary Appointments until the next Meeting of the Legislature, which shall then fill such Vacancies."

One or two features of that language and its setting are notable for our purposes:

(1) The power of executive appointment was to arise only during a recess of the legislature, and appointments under that authority were not to survive the next session of the legislature.

(2) State legislatures as the Founders knew them met annually.[1] Thus, an executive appointee to the Senate could practically never have been expected to hold office for more than a year before the primary method of selection, by the legislature, was once again en-

---

I. See A Collection of the Constitutions of the Thirteen United States of North-American, published by Order of Congress (1783); The American's Guide (1839) (compilation of state constitutions). See generally, Dealey, Growth of American State Constitutions (1915); Morey, The First State Constitutions, IV Annals of the American Academy of Political and Social Science 201, 220 (1893); Nevins, American States During and After the Revolution 1775–1789 at 165–68 (1924).

forced.[2] And in fact no such appointee up to 1814 ever held office for longer than a year.[3] In the years after adoption of the Constitution, however, state legislature came increasingly to meet biennially, resulting in some drift (apparently never tested or debated) away from the original understanding.[4]

Thus, when the Seventeenth Amendment came to be adopted—substituting choice by the people for choice by the legislature—it had been familiar for well over 100 years that the preferred mode of selection under the Constitution was to be dominant over and confine the interim power of appointment. Our problem may fairly be stated—and in some measurable degree resolved—by asking whether the Amendment can be read to have allowed substantially longer appointments to postpone the will of the people than had been intended to postpone a legislative designation.

Further illumination from the original Constitution is found in its provisions respecting the House of Representatives. Members of the House were, of course, elected "by the people" from the beginning (Article I, section 2, clause 1) for two-year terms. There was no provision for interim executive appointments. Instead, clause 4 of the same section provided, as it still does:

"When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies."

Again, it seems useful to note specifically some pertinent thoughts generated by this cognate provision:

(1) Though House terms were never to last more than two years, the state executive was and is directed to (he "shall") order elections to fill interim vacancies.

(2) The mandatory language of the Seventeenth Amendment, saying the executive "shall issue writs of election to fill such vacancies," duplicates the language applicable from the beginning to the House.

(3) Neither the governor nor the people are ever in "recess," and it appears that no need was perceived to have recess appointments during the presumably brief period required to fill the vacancy by popular election.

(4) Since each state was to have only two Senators, and each was to represent the State as a whole, a Senate vacancy would in most cases effect a greater proportionate loss of representation than would a vacancy in the House. See 2 Farrand, The Records of the Federal Constitution of 1787 at 231 (Madison's notes) and 242 (King's notes) (rev.ed. 1966). Cf. H.R.Rep. No. 88, 56th Cong., 1st Sess. 4–5 (1900). Accordingly, by providing for executive appointments, the framers undertook to ensure that there would be no Senate vacancies even during the state legislative recesses of less than a year.

2. Even if the legislature waited until the end of its session to choose a successor, the appointee, having been chosen *after the end* of the preceding session, would in all likelihood have served less than a year.

3. The first departure was the appointment of Senator Jesse Wharton of Tennessee to a term from March 17, 1814 to October 10, 1815. Senate Manual, S.Doc. No. 1., 90th Cong., 1st Sess. 715 (1967) (hereinafter "Senate Manual").

4. As the majority notes, there were 179 appointees who served between 1789 and 1913, when the Seventeenth Amendment became effective. Of these 32 served for over a year, and only 17 served for over 14 months. The longest appointment was that of Senator Robert Wilson of Missouri who served for 22 months, from January 17, 1862, to November 13, 1863. Senate Manual, supra at 694.

Apart from the details, the most striking aspect of the provisions respecting the House was that vacancies which could never have lasted for over two years were to be filled by popular election. The obvious, and obviously workable, premise was that effective elections could be organized and completed with sufficient speed so that it would be worthwhile to fill such relatively brief gaps in this way.

Both the original provision respecting temporary appointments for Senate vacancies and the House provision for elections to fill vacancies were combined in significant fashion when the Seventeenth Amendment was drafted. The constitutional language relating to the House was carried over without change in its mandate requiring the ordering of elections by the state executive. The original language relating to the Senate— and providing, as we have seen, for vacancies between the annual meetings of the original state legislatures—was likewise adapted to the new scheme of popular elections. The amended draft, ultimately to become the Seventeenth Amendment, was offered by Senator Bristow. Speaking with authority as author of the language in question, and as a key proponent of the Amendment, Senator Bristow supplied a cogent, squarely apposite, and never questioned account of the drafting enterprise. His words, described by my senior colleagues as "one brief reference to the vacancy provision * * * [which] supports plaintiffs' position in this case," bear reproduction here:

"The only other change that is proposed to be made in the Constitution as it is now is a provision for the filling of vacancies. The Constitution as it now reads, referring to vacancies in the Senate, says:

'And if vacancies happen by resignation or otherwise, during the recess of the legislature of any State, the executive thereof may make temporary appointments until the next meeting of the legislature, which shall then fill such vacancies.'

"Instead of that, I provide the following:

'When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies.'

"Which is exactly the language used in providing for the filling of vacancies which occur in the House of Representatives, with the exception that the word 'of' is used in the first line for the word 'from,' which, however, makes no material difference.

"Then my substitute provides that—

'The legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct.'

"That is practically the same provision which now exists in the case of such a vacancy. The governor of the State may appoint a Senator until the legislature elects. My amendment provides that the legislature may empower the governor of the State to appoint a Senator to fill a vacancy until the election occurs, and he is directed by this amendment to 'issue writs of election to fill such vacancies.'

"That is, I use exactly the same language in directing the governor to call special elections for the election of Senators to fill vacancies that is used in the Constitution in directing him to issue writs of election to fill vacancies in the House of Representatives." 47 Cong.Rec. 1482–83 (1911).

That "one brief reference" does not stand alone. Like the final version of the Amendment, its precursors characteristically took from the Constitution the words relating to House vacancies (in Article I, section 2, clause 4) which instruct the state executive to "issue Writs of Election to fill such Vacancies." See, e. g., H.Res. 90, H.R.Rep. No. 368, 52d Cong., 1st Sess. 1 (1892); H.Res. 20, H.R.Rep. No. 944, 53d Cong., 2d Sess. 1 (1894); H.J.Res. 28, H.R.Rep. No. 88, 56th Cong., 1st Sess., pt. 2, p. 2

(1900). Then, adapting the provision in Article I, section 3, clause 2, for "temporary appointments" between sessions of the state legislature, the proposed versions provided for such appointments until the next general election for "members of the House of Representatives in Congress"[5] or merely until "the time of the next general election."[6]

Of greatest interest, however, is the language sponsored and explained in 1892 by Representative Henry St. George Tucker, who proposed an amendment for the popular election of Senators with a vacancy provision identical to the ultimately ratified text, except for the unexplained omission of a comma in the latter.[7] Explaining the proposed language, Congressman Tucker's Report, H.R.Rep. No. 368, 52d Cong., 1st Sess. 4–5 (1892), said:

"Where vacancies occur the executive of the State shall direct writs to issue for holding the election by the people to fill the vacancies; or, by law, the legislature may empower the executive to fill the same temporarily until an election can be had.

"Under this clause the governor must order an election to fill the vacancy that has occurred. This preserves the principle of election by the people. In some States, however, in which there are annual elections, this would be a hardship, for the vacancy would in most cases not be of long duration, and to add another State election would be imposing an unnecessary expense on the people, so that the proviso was thought to be wise by which the governor may be empowered to fill the vacancy 'until the people fill the vacancy by election, as the legislature may direct.'

"Under this provision in a State where there are biennial elections the legislature might direct that if a vacancy occurred within a year [or any other period it might fix] after the election, the vacancy should be filled by an election by the people; but if the vacancy occurred more than a year after the election the vacancy should be filled by executive appointment. This optional feature in the filling of vacancies was as far as your committee deemed it prudent to go in this direction."

That predecessor explanation, undoubtedly well known to the later legislative leaders who copied the Tucker proposal with which it went,[8] was a clearly sensible and apt description of what the language was meant to accomplish. No other or different account was given for the substantially identical language later passed and ratified. Without pretending to use jeweler's scales, we must surely acknowledge that some weight attaches to the quoted words. And this item, like many others, is opposed to defendants' position.

It fits perfectly with the language and surroundings of the vacancy provision to say, as Congressman Tucker did, that the state legislature was authorized to "empower the executive to fill the same temporarily until an election can be had." Not, as defendants argue, until the end of any time short of six years which the state legislature might choose to deem "temporary." More specifically, Mr. Tucker, properly emphasizing the controlling "principle of election by the people," but yielding to the countervailing "expense on the people" of repeated elections *in a single year*, explained the "optional feature" as permitting appoint-

5. S.Rep. No. 794, 52d Cong., 1st Sess. 2 (1892); S.Rep. No. 530, 54th Cong., 1st Sess. 11 (1896); H.R.Rep. No. 88, 56th Cong., 1st Sess., pt. 2, p. 2 (1900).

6. S.Rep. No. 916, 53d Cong., 3d Sess. 1 (1895); H.R.Rep. No. 994, 54th Cong., 1st Sess. 1 (1896).

7. See majority opinion note 7 and text. The lost comma has been a subject of little discussion in either the briefs or the prevailing opinion. I follow those tasteful examples.

8. Representative Tucker's authorship was expressly acknowledged on the Senate floor during the debates leading directly to the Seventeenth Amendment. 46 Cong.Rec. 2940 (1911).

ments for *no more* than a year. And that, of course, recalled and adapted the original understanding—confining the appointive power as narrowly against the people as it had been confined against the state legislature.

Other items of pertinent history point in the same direction. Among the Founders themselves, the device of gubernatorial appointment was deprecated as a somewhat dubious expedient; there was skepticism as to whether "executives might be safely trusted" with such power, which, one member observed, would remove "the appointment too far from the people * * *." Such doubts appear to have been overridden only "in order to prevent inconvenient chasms in the Senate." 2 Farrand, The Records of the Federal Convention of 1787 at 231 (Madison's Notes) (rev. ed. 1966).

In the event, as we know, balancing *legislative* power against the executive, the Founders apparently deemed it tolerable to accept appointments likely to last less than a year precisely because they were to be effective only "for so short a time." *Ibid.*

Preserving this narrow view of the appointing power, the Senate itself, in the years before the passage of the Seventeenth Amendment, consistently refused to seat an appointee of the governor if a state legislative term intervened between the occurrence of the vacancy and the appointment, or if the state legislature convened after the appointment and failed to elect. 1 Haynes, The Senate of the United States 161–63 (1960); Senate Election, Expulsion and Censure Cases from 1789 to 1960, S. Doc. No. 71, 87th Cong., 2d Sess. 2, 7, 19, 20 (1962).

While the documentation is by no means conclusive, there is substantial evidence to indicate that those who pressed for the Seventeenth Amendment were familiar with that history and that attitude. Thus, in reports recommending close predecessor counterparts of what

became the Amendment, Congressman Corliss, in 1900 and 1902, observed:

> "Never in the history of the Senate, it can be creditably said, has that body seated a person seeking admission by appointment from the governor after the legislature of the state had failed to elect." H.R.Rep. No. 88, 56th Cong., 1st Sess. 5 (1900).[9]

The same reports reflected a grudging and narrowly confined view of the power to be given the Governor under the new provisions for popular elections. They observed that in the existing scheme of legislative designation of Senators,

> " 'the governor of a State and his friends, by cabal, intrigue, and maneuver may so arrange that the legislature will decide not to elect, or would fail to elect, in order that the governor might gather to himself the power to fill the vacancy.' " H.R.Rep. No. 88, supra at 6; H.R.Rep. No. 125, supra at 6.

They expressed a determination to thwart expansions of the gubernatorial power over vacancies and to make it "impossible to defeat the will of the people * * *." *Ibid.*

While the quoted words were written in 1900, and again in 1902, they reflected sentiments that appear to have remained active in the final stages leading to the Seventeenth Amendment. Those earlier reports were cited in the report of a decade later which brought the amending enterprise to fruition. See S.Rep. No. 961, 61st Cong. 3d Sess. 12, 13 (1911), which cited the above reports, and the substance of which was in turn copied in H.R.Rep. No. 2, 62d Cong., 1st Sess. 1 (1911). What may be far more significant, the language carried over and enacted from drafts many years old is exactly consistent both with the quoted explanations and the revealing history of senatorial appointments prior to the Seventeenth Amendment.

The historical materials I have mentioned are of special interest when it is

---

9. H.R.Rep. No. 125, 57th Cong., 1st Sess. 5 (1902) repeats the quoted words verbatim, except for a change in the eleventh word to "credibly."

agreed, as it must be, that the Constitution supplies no arithmetical or dictionary solution for our problem. It seems clear, notwithstanding the extreme contrary view to which the logic of defendants' position has somehow driven them, that the provision in the Seventeenth Amendment for "temporary appointments," pending the preferred course of choice by popular election, could not faithfully be read to allow appointments for anything approaching the full six years in the case of a vacancy occurring early in the term.[10] Given that premise (upon which the three members of this court are agreed), the need is for a constitutional judgment, having regard to the context and paramount purpose of the text, declaring the point (or at least the closely defined "neighborhood") where the line limiting "temporary" must be drawn. And so it is pertinent, if not in itself decisive, that the long pre-existing environment in which the Amendment was placed (1) had made familiar a pattern of executive appointments in the Senate averaging well under a year, (2) had been constructed with such a time limitation clearly in view, and (3) included a provision for special elections to fill House vacancies for unexpired terms inevitably shorter than two years in duration.

## II.

I arrive, finally, at what is center stage in this case, the text of the Seventeenth Amendment. The two permanently operative paragraphs read as follows:

"The Senate of the United States shall be composed of two Senators from each state, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislatures.

"When vacancies happen in the representation of any State in the Senate, the executive authority of such State shall issue writs of election to fill such vacancies: *Provided,* That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct." [11]

The vital substance of the change this Amendment wrought was its provision that the Senators of a State should be "elected by the people thereof * * *." Where the occasion arises to say what it is about, capturing its essence, we are likely to observe that "when Senators are chosen, the Seventeenth Amendment states the choice must be made 'by the people.'" Gray v. Sanders, 372 U.S. 368, 380, 83 S.Ct. 801, 809, 9 L.Ed.2d 821 (1963). The Amendment marked a new and higher stage in the unfolding "concept of 'we the people' under the Constitution * * *." *Id.* at 379–380, 83 S.Ct. at 808. It was tendered by the Congress for ratification after the pressure for such an expansion of popular sovereignty had mounted to the point of irresistibility. 1 Haynes, The Senate of the United States 81–106 (1960); S.Rep. No. 961, 61st Cong., 3d Sess. 14–15 (1911).

It is vital to dwell upon and to apprehend fully that this broadening by the Seventeenth Amendment of the area for "the exercise by the people of their choice," United States v. Classic, 313 U.S. 299, 317, 61 S.Ct. 1031, 1038, 85 L.Ed. 1368 (1941), implements one of the enduring and "great purposes which were intended to be achieved by the Constitution as a *continuing instrument of government.*" *Id.* at 316, 61 S.Ct. at

10. Invoking the dictionary as a prime aid, and citing an array of cases from remote legal universes, defendants say (Memorandum, p. 12) "it is apparent that an appointment for two years and six months would be a 'temporary appointment' since it is less than a full six year term."

11. The third and final paragraph, serving a temporary purpose long since completed, says:

"This amendment shall not be so construed as to affect the election or term of any Senator chosen before it becomes valid as part of the Constitution."

1038.[12] "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." Wesberry v. Sanders, 376 U.S. 1, 17, 84 S.Ct. 526, 535, 11 L.Ed.2d 481 (1964); see also Reynolds v. Sims, 377 U.S. 533, 555, 561–562 (1964). And so where this kind of elemental right is expanded, it is important to keep in sharp focus that it is the *right* which is "of the essence" and that "restrictions" or qualifications fall naturally into a straitened and subordinate place. See Reynolds v. Sims, 377 U.S. 533, 555, 561–562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). We should be guided by this as a pervasive axiom in the study of the problem before us.

Following the primary mandate for popular election in its first paragraph, the second paragraph of the Amendment begins with the same major and preferred procedure as the means of filling vacancies, namely, by "writs of election * * *." It is only thereafter that the expedient here in question is permitted, as a proviso, in the authorization saying

"That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election as the legislature may direct." The two clauses together end as they begin, with the reasserted power of "the people * * * by election" to terminate the temporary appointment and install their choice.

So we have in sum a six-year term to be filled by the people; vacancies to be similarly filled; and a power to make "temporary appointments" only until state officials, sworn to obey the Federal Constitution, can make suitable arrangements for the popular will to be expressed. It is, as has been acknowledged, not possible to find in the text alone an explicit prohibition against a "temporary appointment" extending for almost half the six-year term. What is less possible, however, is to accept that the words, and the order of words, comprising the Seventeenth Amendment can tolerably be read to allow such a result.

Undertaking, as we must, to expound a Constitution, we could not readily find complete answers in interpretative "can-

12. S.Rep. No. 961, submitted by Senator Borah, one of those in the vanguard fighting for the Amendment, reported favorably on S.J. Res. 134, an immediate predecessor and close counterpart of the Resolution passed in the following year. This document described in specific and cogent terms the process of "maintaining" the fundamental principles of the Constitution by the kind of adaptive change the Seventeenth Amendment came to effect (id. pp. 3–4):

"It is proper to take into consideration the condition of affairs with reference to popular voting at the time of the formation of the Constitution. Very few of the States gave to their citizens the unqualified right to vote and very few allowed the people the right to elect any considerable number of officials. Most of the offices in the State were filled by appointment, some by the legislature, some by the chief executive. For a number of years, the legislature, had been practically a gathering of the people, that is to say, the body through which they acted in sundry matters not strictly legislative. A vast change has taken place since then. At the present time practically all of the officers from precinct officer to the President

are elected, with certain exceptions as to the judiciary. The President, in view of the function now performed by the electors, is in reality elected by popular vote. Manhood suffrage has everywhere become general and practically unqualified. "We do not cite these historic facts for the purpose of in any way seeking to impeach or criticize the remarkable men who framed our Constitution. In the science of government none have ever excelled the men who gathered at Philadelphia for the great task of 1787. The general principles of government which they announced and incorporated into the charter few indeed would challenge. But in the mechanism or machinery by which those general principles are applied from decade to decade, or century to century, there may arise the necessity of change. The economic, social, and industrial changes which have taken place since the present method of electing Senators was established seem to require a reconsideration of the method; not for the purpose of changing the fundamental principles of our Government, but for the purpose of maintaining the very principles which the fathers sought to establish."

ons" any more than in the text alone. But a pertinent guide to construction helps to explicate and reinforce what follows from weighing the relative values at stake in the case. New York's Election Law § 296 would have to be justified, if it could be, in a proviso—the kind of narrow, incidental, restricted item of legislative grammar which is always presumptively entitled only to a strict construction. Piedmont & Northern Ry. Co. v. Interstate Commerce Comm., 286 U.S. 299, 311–312, 52 S.Ct. 541, 76 L.Ed. 1115 (1932); United States v. McElvain, 272 U.S. 633, 638–639, 47 S.Ct. 219, 71 L.Ed. 451 (1926); Ryan v. Carter, 93 U.S. 78, 83–84, 23 L.Ed. 807 (1876); Dollar Savings Bank v. United States, 19 Wall. 227, 86 U.S. 227, 235–236, 22 L.Ed. 80 (1873); United States v. Dickson, 15 Pet. 141, 40 U.S. 141, 163–165, 10 L.Ed. 689 (1841). The interim function of the appointing power was thus expressed in the traditional form suited to its subordinate status.

Another guide to construction is even more specifically and substantively pertinent. Long before the passage of the Seventeenth Amendment, the state courts had repeatedly interpreted their constitutional and statutory provisions governing temporary appointments to elective offices to permit an appointee to remain in office "only until the people who elected his predecessor have the first opportunity to fill the office with a person of their own choice * * *." State ex rel. McGowan v. Sedgwick, 46 Mont. 187, 127 P. 94, 95–96 (1912). See also, e. g., People ex rel. Baird v. Tilton, 37 Cal. 614, 621 (1869); State ex rel. Weeks v. Gamble, 13 Fla. 9, 14–15, 16 (1870); McCreary v. Williams, 153 Ky. 49, 52–53, 154 S.W. 417, 419–420 (1913); Attorney General ex rel. Lawrence v. Trombly, 89 Mich. 50, 56, 57, 50 N.W. 744, 746, 747 (1891); State ex rel. Smallwood v. Windom, 131 Minn. 401, 155 N.W. 629, 632 (1915); State ex inf. Barrett ex rel. Shumard v. McClure, 299 Mo. 688, 253 S.W. 743, 744 (1923); State ex rel. Castle v. Schroeder, 79 Neb. 759, 760–761, 113 N.W. 192, 193 (1907); People ex rel. Kehoe v. Fitchie, 76 Hun. 80, 28 N.Y.S. 600 (2d Dep't 1894); Rodwell v. Rowland, 137 N.C. 617, 623, 50 S.E. 319, 321 (1905); State ex rel. Harsha v. Troxel, 125 Ohio St. 235, 181 N.E. 16, 17 (1932); State ex rel. Whitney v. Johns, 3 Or. 533, 535 (1869); Commonwealth ex rel. Broom v. Hanley, 9 Pa. 513, 519 (1848); State ex rel. Rearick v. Board of Com'rs of Lyman County, 34 S.D. 256, 145 N.W. 548 (1914); 132 A.L.R. 574, 576 (1941) (citing cases). Cf. State ex rel. Lanier v. Hall, 74 N.D. 426, 23 N.W.2d 44, 48 (1945).

Even on a rather general approach to problems of construction we should be disposed to find the same premise in the Seventeenth Amendment—upon the sound presumption "favoring the retention of long-established and familiar principles * * *." Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952); S. & E.C. v. Capital Gains Bureau, 375 U.S. 180, 194–195, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963); Ex Parte Grossman, 267 U.S. 87, 108–109, 45 S.Ct. 332, 69 L.Ed. 527 (1925). But there is far more compelling and focused pressure behind such a conclusion. What the line of state cases reflects is a unified body of axioms for representative government—all leading to the stand that "the emergency of the public business" is "the only excuse for the appointment of any officer made elective under the law * * *." Todd v. Johnson, 99 Ky. 548, 36 S.W. 987, 989 (1896). That position, required by "general principles of democracy," State ex rel. Sullivan v. Moore, 49 Ariz. 51, 64 P.2d 809, 816 (1937), is overwhelmingly more significant than defendants' resort to the dictionary for definitions of "temporary."

An indication of a similar sort is found in the Constitution of New York State itself, which provides that an appointee filling a vacancy in an elective office may serve no more than approximately a year—or, to be absolutely precise, a conceivable maximum of just un-

der fourteen months.[13] This applies, defendants remind us, only to *state* offices, and they are certainly right about that. What is less clearly right is the suggestion that the New York constitutional provision is therefore of no moment for our problem. It is at a minimum a further illustration and confirmation of how the electoral power of the people should be weighed against an executive power to appoint where the overall design (in New York or elsewhere) is to be a "republican form of government."

## III.

The majority decision for defendants rests upon three main grounds: (1) "clear language" found in the Seventeenth Amendment; (2) "contemporaneous" and later "constructions" of the Amendment in the form of unexplained and untested state statutes; and (3) "substantial state interests" said by the court to underlie N.Y. Election Law § 296. Having brooded respectfully over these things, I am forced to say they seem, singly and collectively, quite insufficient to validate the postponement for 2½ years of the popular election required by the Seventeenth Amendment.

1. The textual argument is stated firmly, but not dwelt upon, in the majority opinion. It need not be labored in this dissent.

The Seventeenth Amendment used "clear language," the majority says, in the five words at the end of the vacancy proviso, italicized here:

"That the legislature of any State may empower the executive thereof to make temporary appointments until the people fill the vacancies by election *as the legislature may direct.*"

Rejecting plaintiffs' "subtle reading" for a more "natural reading," the majority finds in these words "some reasonable measure of discretion" supposedly ample to encompass what New York has done.

However, as the majority notes elsewhere, the "clear" meaning of the language to the man who presented it—the meaning he announced to the Senate which passed it—supports plaintiffs rather than defendants. Likewise, an identical predecessor was explained by its author contrary to the majority's interpretation. Far from answering our question, we only state it, acceptably all around, when we speak of a "reasonable discretion" left to the state legislatures. The majority's Tables and Appendices, enlisting so unlikely a body of authority on the Federal Constitution as unannotated state statutes, could hardly be thought relevant if the words "as the legislature may direct" went very far toward a solution.

2. I come to the "contemporaneous interpretations" in the form of state statutes by which the majority has been "strongly influenced." There are many considerations, in my view, which should have served to weaken or dissipate the influence of this argument. I outline these thoughts in roughly ascending order of importance.

For one thing, these so-called "interpretations" consist only of the bare texts of various (and varying)[14] state statutes

---

13. "[I]n case of elective officers, no person appointed to fill a vacancy shall hold his office by virtue of such appointment longer than the commencement of the political year next succeeding the first annual election after the happening of the vacancy." N.Y.Const. Art. XIII, § 3. The "political year" commences in New York on January 1. Id. § 4.
In an effort at what may be excessive precision, I have indicated that the quoted provisions might permit an appointee to serve for nearly fourteen months. This would be the case where a vacancy oc-

curred immediately following an annual November election, permitting the appointee, if he were designated promptly, to serve until a year after the succeeding January 1.

14. The majority notes the variations. While the main opinion refers often to a "clear consensus" discerned in the state legislation, it also says "the wide variation" among the state statutes "reflects an interpretation of the Amendment which would allow the states a liberal degree of discretion * * *." I am sure the

which were never tested or explained in any way that would endow them with reliable meaning. , It reveals no privileged matter to say that in our conferences together we have found ourselves snarled in repeated errors and uncertainties when we debated these sparse, unfamiliar, unconstrued materials. Where patent issues of constitutional law were likely to be stirred whenever the limits were tested—but where the time for testing never came until now—we should hardly accept as a considered gloss upon the United States Constitution "the dead words of the written text[s][15] of diverse state statutes.

Even taking those texts by themselves, we find only five states whose statutes passed between 1913 and 1915 would seem literally to have allowed "temporary appointments" extending for more than two years.[16] And it is interesting to recall that New York was clearly outside this category; until 1951 its statutes would have required an election of Senator Kennedy's successor within less than five months after his death, on November 5, 1968.

Going slightly beyond the state statutes to actual experience, we find a total of 156 gubernatorial appointments to the Senate in the years from 1913 through the beginning of 1967.[17] Of these, 109 (70%) ran for no more than a year; 128 (82%) for no more than 18 months; and 154 (98.7%) for no more than two years.[18] Measuring the period from inception of the vacancy to end of appointment (corresponding to the period of just under 30 months from Senator Kennedy's death on June 6, 1968, to the end of Senator Goodell's term on November 30, 1970, as announced by Governor Rockefeller), 106 (68%) of the recorded appointments would fall into the category of no longer than a year; 124 (80%) no longer than 18 months; and 152 (97%) no longer than two years.[19] In short the actual experience of temporary appointments in the 55 years since the Seventeenth Amendment became effective reveals not a single case of an asserted power to appoint as broad as we have here, and only a minuscule number of approaches to this extreme.

That experience may serve as partial explanation why neither counsel nor judges have found square precedents to guide us.[20] But the important point

appearance of inconsistency is superficial only, but it does suggest how treacherous and ambiguous a guide to the Federal Constitution is supplied by collections of state statutory texts by themselves, with no illumination in the form of debates, court tests, or other sources of live understanding.

15. Nashville, C. & St. L. Ry. v. Browning, 310 U.S. 362, 369, 60 S.Ct. 968, 84 L.Ed. 1254 (1940); see also Bernhardt v. Polygraphic Co., 350 U.S. 198, 209–210, 76 S.Ct. 273, 100 L.Ed. 199 (1956) (Mr. Justice Frankfurter concurring).

16. Mich. Public Acts 1915, No. 156, pp. 261, 262; N.M.Laws 1915 J.R. No. 12, p. 172–73; N.C.Laws 1913, ch. 114, p. 206; Ohio Laws 1914, H.B. No. 3, p. 8; Pa.Laws 1913, No. 454, p. 995.

17. Senate Manual, supra note 3 at pp. 661–725. In four instances, a vacancy was filled by appointment, the appointee died, and a successor appointee was named. Giving the benefit of any possible doubt to defendants herein, I have in each such instance tacked the appointments together and treated the pair as a single appointment for computing overall length.

18. Two appointees served for approximately 25 months. Senator William M. Butler of Massachusetts served by appointment from November 13, 1924, to December 5, 1926. Senate Manual, supra, at 689. Senator Joseph H. Ball of Minnesota was appointed on October 14, 1940, and served until November 17, 1942. Senate Manual, supra, at 691.

19. The longest period thus measured was 27 months. The term served by Senator Ball of Minnesota, supra note 18, lasting until November 17, 1942, was for a vacancy which had commenced on August 31, 1940. Senate Manual, p. 691.

20. Additional explanation may lie in differing conceptions of the non-justiciable "political question." It may be observed, however, that while they never come to the point of resolution, objections were in fact raised by interested groups to exercises of power approaching that involved here. Thus, when Senator Henry Cabot Lodge of Massachusetts died

now is that the so-called "contemporaneous interpretations" turn out to be untested and unreliable props for what is in fact a novel position in this case.

The absence of judicial or other contests over those state statutes is more than a negative generality; it is, in our context, a factor of potentially critical significance. For, as we have mentioned earlier, there is an old and salutary presumption favoring compression of appointive terms in elective offices. While New York's law officers now treat their State's constitutional embodiment of this principle as a protector of popular sovereignty only for *state* offices, we may suppose that other state officials and state courts might have applied the same bedrock doctrine to the Senate of the United States under the Seventeenth Amendment. And whether they would have or not, this first federal court to face the question should not fail to do so.

Moving onward, we come to some important principles and recent precedents

impairing the supposed vigor of state statute books as authorities on Federal Constitutional Law. While the majority speaks of "contemporaneous interpretations" as the essence of this point, it bears emphasis that the great bulk of the statutes supposedly favoring defendants (like New York's own) post-date by long periods the adoption of the Seventeenth Amendment. We are instructed, on the soundest grounds, that "the views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." United States v. Price, 361 U.S. 304, 313, 80 S.Ct. 326, 332, 4 L.Ed.2d 334 (1960); Waterman S.S. Corp. v. United States, 381 U.S. 252, 268–269, 85 S.Ct. 1389, 14 L.Ed.2d 370 (1965). Consider by comparison how utterly useless are later *state* enactments, by shifting memberships, with no slight evidence of constitutional questions actually faced, as indices to the meaning and intent of the varied "authors" of a federal constitutional amendment.[21]

---

five days after the regular biennial state election and the appointee was to serve from November 13, 1924 to November 2, 1926, the Democrats threatened to seek the repeal of the Massachusetts statute on the ground that the appointment thus permitted was not "temporary." 1 Haynes, The Senate of the United States 166–67 n. 2 (1960).

21. We owe, and cheerfully pay, deference to state legislatures in their proper spheres. This is not a mandate, or even a license, to ignore what everybody, including judges, knows. Sitting as the first level of the judiciary responsible for saying authoritatively what the Federal Constitution means, we are compelled to know how poorly state legislative proceedings are geared for an authoritative share in the task. Deliberation and scholarship, let us admit, do not characterize the frequently hectic activities of these bodies. For references to the well known facts, see, e. g., Keefe, "The Function and Powers of the State Legislatures," and Wahlke, "Organization and Procedure," in The American Assembly, State Legislatures in American Politics, at 65–68 and 145–48, respectively (Heard ed. 1966); Keefe and Ogul, The American Legislative Process 126–28, 177–78, 191–93,

206–10, 244–48 (1964). For the proposition that even the national Congress, far superior in this respect, tends usually to leave constitutional questions for the courts, see generally Morgan, Congress and the Constitution (1966).

The point is illustrated by reference to some statistical records, which are the only kind available, relating to the context of the state statute before us. N.Y. Election Law § 296 was passed by the Assembly on March 15, 1951, the next-to-last day of the session. The Assembly on that day considered 124 bills and 10 resolutions. 123 of the bills and all of the resolutions were passed. 99 of the bills were passed with no negative votes. N.Y. Assembly Journal, 174th Sess., vol. 3, pp. 2779–2954 (1951). § 296 was passed by a vote of 85–62. Id. pp. 2918–19. On March 16, the last day of the session, the Senate passed § 296. It was one of 175 bills considered in the Senate on that day, along with 14 resolutions. 173 of the bills and all of the resolutions were passed. 157 of the bills were passed with no negative votes. N.Y. Senate Journal, 174th Sess., vol. 2, pp. 2008–2158 (1951). § 296 was passed by a vote of 38–23. Id., p. 2039. The Governor approved § 296 on March 24, 1951. He signed 86 bills on that day.

In any event, far clearer, and more impressively "contemporaneous," assertions of power by state legislatures have fallen when they could not be squared with what the Federal Constitution was found compellingly to mean. Compare the decision of the Court in Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed. 2d 663 (1962), with the dissents of Mr. Justice Frankfurter (id. at 310–318, 82 S.Ct. at 760–765) and Mr. Justice Harlan (id. at 333–334, 82 S.Ct. at 772–773); similarly, see the unavailing dissent in Reynolds v. Sims, 377 U.S. 533, 602–608, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); and see Brown v. Board of Education, 347 U.S. 483, 489, 74 S.Ct. 686, 98 L.Ed. 873 (1954), finding "[a]t best, * * * inconclusive" a history which included a showing that a majority of the States ratifying the Fourteenth Amendment had established segregated schools at the time of ratification or shortly thereafter, and that, in most instances, these States retained systems of segregated education for substantial numbers of years.[22] As Baker v. Carr and Reynolds v. Sims recall, a decision invalidating the only state statute actually before us would hardly be the first or most far-reaching determination that one or more States may have been insufficiently zealous to enforce fully the regime of popular sovereignty.

3. Let us talk now of the "state interests" deemed so "substantial" by the majority that they justify a "temporary appointment" which will leave to "the people * * * by election" only the power to fill *the last month* of the 32 that remained of Senator Kennedy's term when he was murdered.

As it is appealingly described by the State's Attorney General, one such supposedly weighty "interest" emerges from this proposition: "The selection of a candidate in a primary election and the election of the Senator at a general election in either a gubernatorial or presidential [i. e., even-numbered] year insures the greatest numerical participation of voters in the selection of the Senator."[23] The troubles with the sentence are:

(1) When § 296 was enacted in its present form (N.Y.Laws 1951, ch. 257), there was no direct primary election for Senator. Such primaries, still somewhat restricted in nature, were not created until 1967. Laws 1967, ch. 716, § 2, effective January 1, 1968.[24] So all the talk in defendants' brief and the majority opinion extolling the virtues of primaries has nothing to do with the case because this could not conceivably have been any supposed part of the unannounced "interests" leading to the 1951 enactment before us.

(2) The asserted striving for "greatest numerical participation of voters" results, in the concrete (and only) cases before us, in (a) *no* participation by *any* voters, and (b) the selection of a Republican appointee to complete well over two years of a term to which a Democrat had been elected by the people.[25]

22. Appendix to the Supplemental Brief for the United States as Amicus Curiae at 160–393, Brown v. Board of Education, supra.

23. Memorandum of Law on Behalf of Defendants, pp. 10–11.

24. Earlier, the voters had been empowered to elect delegates to party conventions, which in turn selected Senatorial candidates.

25. The majority not only accepts defendants' theory about even-numbered years, but adds what I think is a strange embellishment. Since local elections occur in old-numbered years (as Senate vacancy elections could and did until 1951), we are told that "[t]he legislature might reasonably have concluded that local elections should be preserved from the more party-oriented political currents generated by statewide or national contests." When we talk about what the State Legislature "might * * * have concluded," since we have not a single word from a single legislator about what actually went on, the quality of speculation is not cramped.

Counsel for defendants have also told us (and the majority embraces this) that there was a "concensus of those in the state that conducting a statewide election was too expensive a proposition, and therefore as the consensus of the political parties the biennial provision was put into Election Law 296." We should not be finicky about things like hearsay in a case of this kind. But we are entitled (or, probably, required) to know that the location of a "consensus" is sometimes an elusive task. It must be observed, moreover, that the asserted expense is nowhere particularized or documented beyond the generality just quoted. And it is worth noting again in this connection that New York's own Constitution (supra note 13), expensively or not, forbids the filling of state elective offices by appointments of more than approximately a year's duration.

This does not mean, of course, that the question of expense is immaterial. It means only that the subject must be kept in proportion. It is one thing to say "expense" and feel that this goes some distance to justify an extravagant postponement, for 2½ years, of a popular election. It is another, far more useful, far more pertinent thing to recall that Congressman Tucker, author of an identical predecessor to the provision we are construing, considered expense and deemed it a sufficient concern to permit the States, along traditional lines, to decide against the holding of more than one election *in a single year*.

Times have changed since 1892, and since 1913, but not in any way that makes money a more legitimate counterweight today against the value of popular elections. We are more affluent. Campaigning costs more. The problem of campaign expenses is real and troublesome. The problem has generated many proposed solutions, but rarely, if ever, the idea that for this reason interim appointments, postponing popular elections, should be for longer periods.[26] It is not jingoistic or inapposite, considering our subject, to mention how sternly this century is testing our professed ideals. It may be supposed, therefore, that a people spending millions for jingles about toothpaste will not need to sacrifice or shrink the principle enshrined in the Seventeenth Amendment because it costs money.

To summarize it, my view about the "substantial state interests" stressed by the majority is that they are at least in some degree exaggerated; that the supposed benefits sought by the State in Election Law § 296 are too remote and unsubstantial to warrant the resulting denial of the popular will; and that the bulk of the asserted objectives (selection of candidates at a primary, handling of campaign expenses) can be achieved without such impairment of so dear a constitutional value. Cf. Harman v. Forssenius, 380 U.S. 528, 543, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Swann v. Adams, 385 U.S. 440, 444, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967). This would be true if we were "balancing" the interests now in deciding how to write the Seventeenth Amendment. It is more clearly true, I submit, when we attend to the indicia of the meaning intended by those who wrote and adopted it for us over half a century ago.

IV.

The majority, sustaining a delay of 2½ years, is not required to decide, and does not decide, how much longer even

But this particular thought seems to me particularly imaginative, extending beyond what the State Attorney General and Solicitor General recreated on behalf of the defendant Governor and Secretary of State.

**26.** Cf., e. g., "Financing Political Campaigns," Hearings before the Senate Committee on Finance on S. 3496, 89th Cong., 2d Sess. (Aug. 18 and 19, 1966); "Political Campaign Financing Proposals," Hearings before the Senate Committee on Finance, 90th Cong., 1st Sess. (June 1, 2, 6–9, 1967).

than that the State might validly postpone a popular election. Concluding in dissent that 31 months is too long, I should and do express a view indicating how much is not too long. The answer, I have confessed already, cannot be mathematical, or mathematically demonstrated. But I conclude from the materials reviewed above that there is at least a powerful presumption against an appointment for over a year—i. e., for longer than the period of postponed legislative selection under the original Article I, section 3, clause 2. I would require the most impressive kind of justification for any asserted power to appoint for more than a year. I conclude specifically that the period of substantially over two years in question here is patently excessive.

While this conclusion would require a determination that a state legislative provision must be set aside in deference to the Federal Constitution, this surely would rank among the least exacerbated instances of such friction. Of course, the Seventeenth Amendment would have to prevail even if there were plausible reasons to wish otherwise. But it would be comforting that there is no occasion here for so much as sentimental regret. On plaintiffs' side is a claim to the right of popular election, "rank[ed] among our most precious freedoms." Williams v. Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). On the other side is a claim of executive power which, even in the State's hierarchy of political powers, occupies the kind of subordinate role we would here assign it. There is, as I have sought to show, no substantial states interest—surely no "compelling interest," id. at 31, 89 S.Ct. 5—to enhance whatever doubts I should in candor acknowledge regarding a conclusion which is neither

objectively demonstrable nor acceptable to my senior colleagues.

Finally, because the case appears destined for the Supreme Court, I complete this dissent with a few words about the defense suggestion that the Governor is not subject to an order in the nature of mandamus.[27] If we reached the suggestion, all three of us have surmised with confidence that we would reject it. "The applicable principle is that, where state officials, purporting to act under state authority, invade rights secured by the Federal Constitution, they are subject to the process of the federal courts in order that the persons injured may have appropriate relief. * * * The Governor of the state, in this respect, is in no different position from that of other state officials." Sterling v. Constantin, 287 U.S. 378, 393, 53 S.Ct. 190, 193, 77 L.Ed. 375 (1932). Nothing in the *New York* cases defendants cite limits the scope of "appropriate relief" to forms outside the area traditionally called "mandamus."

But it would prove unnecessary to consider this subject at all—including the debatable assumption that the pertinent writ might resemble mandamus. As we could have predicted, the Governor has given his assurance, through his Solicitor General, that a final judgment in this case declaring the constitutional rule will be followed by him and the other responsible officials of the State. There would be no need, therefore, to go beyond the plaintiffs' prayer for declaratory relief.

I would grant the prayer and adjudge that N.Y. Election Law § 296, together with defendants' action under it, must be declared invalid under the Seventeenth Amendment.

---

27. No similar suggestion is made—in fact, it is expressly disclaimed—with respect to the defendant Secretary of State.