*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0327P (6th Cir.)
File Name: 04a0327p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

AMERICAN CIVIL LIBERTIES
UNION OF OHIO, INC.,
    *Plaintiff-Appellant,*

    *v.*

ROBERT TAFT, Governor of
Ohio,
    *Defendant-Appellee.*

No. 02-3924

———————————

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 02-00766—Edmund A. Sargus, Jr., District Judge.

Argued: January 28, 2004

Decided and Filed: September 27, 2004

Before: MARTIN, RYAN, and MOORE, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Scott T. Greenwood, AMERICAN CIVIL
LIBERTIES UNION OF OHIO FOUNDATION, Cleveland,
Ohio, for Appellant. Arthur James Marziale, Jr., OFFICE OF
THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio,

---

for Appellee. **ON BRIEF:** Raymond Vasvari, AMERICAN
CIVIL LIBERTIES UNION OF OHIO FOUNDATION,
Cleveland, Ohio, for Appellant. Arthur James Marziale, Jr.,
Elizabeth L. Schuster, OFFICE OF THE ATTORNEY
GENERAL OF OHIO, Columbus, Ohio, for Appellee. Keith
A. Wilkowski, VASSAR, DILLS & DAWSON, Toledo,
Ohio, for Amicus Curiae.

MOORE, J., delivered the opinion of the court, in which
MARTIN, J., joined. RYAN, J. (pp. 15-20), delivered a
separate dissenting opinoin.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge. In this appeal,
we conclude that Article I, section 2, clause 4 of the United
States Constitution is mandatory, imposing upon a state
executive the duty to issue a writ of election when one of her
state's seats in the United States House of Representatives
("House") becomes vacant during a congressional term.
Because Robert Taft, Governor of Ohio ("Governor Taft"),
refused to issue a writ of election when one of Ohio's seats in
the House became vacant due to the expulsion of James A.
Traficant, Jr. ("Traficant") and more than five months
remained before the next Congress would convene, we hold
that Governor Taft violated Article I, section 2, clause 4 and
denied the voters in Ohio's Seventeenth Congressional
District, including members of the American Civil Liberties
Union ("ACLU"), their rights to vote and to equal
representation in violation of the Fourteenth Amendment.
Accordingly, we **REVERSE** the district court's decision and
**REMAND** so that the district court may award appropriate
declaratory relief and attorney's fees to the ACLU.

## I. BACKGROUND

Traficant represented the Seventeenth Ohio Congressional District ("the District") from January 1985 through July 24, 2002, during the 99th through 107th Congresses. On July 24, 2002, the House passed House Resolution 495, expelling Traficant from the House. Subsequently, Governor Taft publicly announced that he would not call a special election to fill the House vacancy left by Traficant's expulsion. Governor Taft decided, after consulting with local elected officials, not to hold a special election, citing the cost of an election, the difficulty presented by redistricting that was to take effect for the regularly scheduled election in 2002,[1] the small length of time an elected replacement could be expected to serve, and the uninterrupted continuation of constituent services by the Clerk of the House. The 107th Congress was scheduled to adjourn on October 3, 2002; however, it did not adjourn *sine die* until November 22, 2002. Tim Ryan was elected to the House by the "new" Seventeenth District at a general election held on November 5, 2002, but did not take office until January 3, 2003. Therefore, the "old" Seventeenth District was without representation in the House and had diminished constituent services from July 2002 until January 2003.

On August 5, 2002, the ACLU filed a verified complaint in the United States District Court for the Southern District of Ohio, asserting a § 1983 claim and pendent state-law claims against Governor Taft. The ACLU prayed for injunctive and declaratory relief, requiring Governor Taft to call a special election to fill the House vacancy in the District, and for reasonable attorney's fees pursuant to 42 U.S.C. § 1988. On August 19, 2002, the district court issued oral and written orders denying injunctive relief. On August 26, 2002, the district court issued an opinion and order denying the ACLU's motion for a temporary restraining order and a preliminary injunction and dismissing the case, thereby denying a permanent injunction as well. On August 23, 2002, the ACLU filed a motion in the Sixth Circuit requesting emergency injunctive relief pending appeal, which a panel of this court denied on September 4, 2002.

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.[2]

## II. ANALYSIS

### A. Standard of Review

We review a district court's decision to deny a preliminary injunction for abuse of discretion. *Blue Cross & Blue Shield Mut. v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997). We also review a district court's decision to deny a permanent injunction for abuse of discretion, and in doing so, we review the district court's factual findings for

---

[1]At the time he was expelled from the House, Traficant represented the "old" Seventeenth District, which was comprised of Mahoning and Columbiana Counties and parts of Trumbell County. In 2002, however, Ohio redrew its congressional districts. Tim Ryan, who was elected in the November 5, 2002 general election, represents the "new" Seventeenth District, which is comprised of parts of Mahoning, Trumbull, Portage, and Summit Counties. The former Seventeenth Congressional District no longer existed when Traficant was expelled in July 2002, but any special election to fill his seat would have had to follow the old boundaries.

---

[2]We note that the ACLU filed its notice of appeal on August 19, 2002, specifying that the ACLU was appealing the district court's August 19, 2002 order denying "preliminary and permanent injunctive relief and entering judgment for the Defendant." Joint Appendix ("J.A.") at 169. The district court's August 19 written order, however, only denies the ACLU's motion for a temporary restraining order. In its August 19 oral ruling, the district court denied from the bench all injunctive relief, "be it a temporary restraining order and a preliminary injunction or a permanent injunction." J.A. at 228. A final written judgment in the case was entered on August 27, 2002. Therefore, we have jurisdiction over the appeal pursuant to Fed. R. App. P. 4(a)(2). *See Metro. Life Ins. Co. v. Marsh*, 119 F.3d 415, 418 n.3 (6th Cir. 1997).

clear error and review the district court's legal conclusions de novo. *Sec'y of Labor v. 3re.com, Inc.*, 317 F.3d 534, 537 (6th Cir. 2003). Although the district court did not specifically rule on the ACLU's request for declaratory relief, instead dismissing the case in toto after ruling on the ACLU's motion for preliminary injunctive relief, we review a "district court's exercise of discretion under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), for abuse of discretion." *Scottsdale Ins. Co. v. Roumph*, 211 F.3d 964, 967 (6th Cir. 2000).

## B. Standing and Mootness

Jurisdiction, including standing, is "'assessed under the facts existing when the complaint is filed.'" *Cleveland Branch, N.A.A.C.P. v. City of Parma*, 263 F.3d 513, 524 (6th Cir. 2001) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 570 n.4 (1992)), *cert. denied*, 535 U.S. 971 (2002). In order to meet the standing requirements derived from Article III,

> a plaintiff must show: "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Id*. at 523-24 (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.,* 528 U.S. 167, 180-81 (2000)). To bring suit on behalf of its members, an association must show "'its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Id*. at 524 (quoting *Friends of the Earth, Inc.*, 528 U.S. at 181).

The ACLU filed the complaint in this action "on behalf of its members who reside in and who are electors in the Seventeenth Ohio Congressional District." J.A. at 6 (Compl. ¶ 3). In this case, the ACLU has demonstrated that its members would have had "standing to sue in their own right." *Cleveland Branch, N.A.A.C.P.*, 263 F.3d at 524. The ACLU submitted affidavits from Louise Lefkort, Robert H. Sacherman, and Carol C. Sacherman, who were all members of the ACLU, resided in the "old" Seventeenth District, were registered to vote in that district, and desired to vote in a special election to fill the House seat left vacant by the expulsion of Traficant. These members had suffered an actual injury, as they were without representation in the House and had been threatened with the imminent denial of their right to vote. This injury was fairly traceable to Governor Taft's actions because Governor Taft announced that he was not going to issue a writ of election calling for a special election. This injury would have been redressable by injunctive and declaratory relief, in that an injunction requiring Governor Taft to issue a writ of election would have allowed residents of the district to exercise their right to vote and to regain representation in the House.

The ACLU has also shown that the interests at stake in this case are germane to the organization's purpose. The ACLU submitted an affidavit from its Executive Director, Christine Link, explaining the organization's purpose as follows: "*The object of this organization is to aid in maintaining and extending constitutional and other fundamental rights, liberties, privileges, and immunities, and to take all legitimate actions in furtherance of that object without political partisanship.*" J.A. at 161 (Link Aff.) (emphasis in original). This case addresses citizens' right to vote and right to equal representation, which falls squarely within the ACLU's purpose of guaranteeing constitutional and fundamental rights. Finally, this action does not require the participation of individual members of the organization.

While standing is assessed at the outset of the litigation, a case may become moot during the course of litigation, depriving the court of jurisdiction. *Cleveland Branch, N.A.A.C.P.*, 263 F.3d at 524-25. The doctrines of standing and mootness serve different purposes: "In essence, standing concerns only whether a plaintiff has a viable claim that a defendant's unlawful conduct 'was occurring at the time the complaint was filed' while mootness addresses whether that plaintiff continues to have an interest in the outcome of the litigation." *Id.* at 525 (citations omitted). These different purposes are reflected in well-established exceptions to the mootness doctrine, including the doctrine that a case will not become moot if the injury is capable of repetition, while evading review. *Friends of the Earth, Inc.*, 528 U.S. at 190.

At this time, the 108th Congress has convened; therefore, we can no longer provide appropriate injunctive relief. We can, however, still award declaratory relief and attorney's fees, provided the case has not become moot. Vacancies in the House can happen near the end of a congressional term, making it difficult for litigation to provide an effective remedy. *See Jackson v. Ogilvie*, 426 F.2d 1333, 1337 (7th Cir.) (noting, while treating an identical situation, that the case would not be mooted by the inappropriateness of an injunction, that plaintiffs would be entitled to declaratory judgment, and that cases "of this type in the election field are peculiarly 'capable of repetition, yet evading review.'" (quoting *Moore v. Ogilvie*, 394 U.S. 814, 816 (1969)), *cert. denied*, 400 U.S. 833 (1970). In fact, since this case was filed, another House vacancy occurred in Ohio's Third Congressional District due to the resignation of Tony Hall to take a position in the Bush administration. We conclude that the injury involved in this case is capable of repetition, while evading review, and thus is not moot.

## C.  Laches

We agree with the district court's conclusion that the ACLU's action is not barred by the doctrine of laches. Where

a plaintiff seeks solely equitable relief, his action may be barred by the equitable defense of laches if (1) the plaintiff delayed unreasonably in asserting his rights and (2) the defendant was prejudiced by this delay. *Brown-Graves Co. v. Central States, Southeast and Southwest Areas Pension Fund*, 206 F.3d 680, 684 (6th Cir. 2000). In this case, Governor Taft announced on July 25, 2002 that he was not going to call a special election to fill the vacancy in the District. The ACLU filed on August 5, 2002, eleven days later, its complaint, its motion for a temporary restraining order and preliminary injunction, and its supporting memorandum. It is true that in *Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980), we held that a plaintiff seeking to be named on a presidential primary ballot was barred from obtaining injunctive relief because he delayed bringing suit until twenty-five days after he knew the choice of candidates had been made. In *Kay*, however, the defendant Secretary of State introduced evidence specifically demonstrating how this short delay had prejudiced the defendant, in that the Secretary provided evidence that most of the costs associated with the elections preparations had been expended during this delay. *Id.*

In this case, each day that passed may have made it more difficult to hold a special election; however, there is no evidence in the record indicating specifically how this short delay prejudiced Governor Taft. Likewise, there is no evidence that Governor Taft had expended money or made alternate preparations during the delay. We conclude that the passage of eleven days was not unreasonable delay. Moreover, we conclude that Governor Taft has not sufficiently demonstrated that he was prejudiced by this delay.

## D.  Article I, Section 2, Clause 4

Article I, section 2, clause 4 of the United States Constitution addresses the mechanism for filling vacancies in the House that occur during a congressional term, providing:

"When vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Elections to fill such Vacancies." Article I, section 4, clause 1 gives primary control over the election of Senators and Representatives to the states, providing: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Place of chusing Senators." Congress, in turn, has enacted 2 U.S.C. § 8, indicating that states have the authority to determine the time of elections, providing: "The time for holding elections in any State, District, or Territory for a Representative or Delegate to fill a vacancy, whether such vacancy is caused by a failure to elect at the time prescribed by law, or by the death, resignation, or incapacity of a person elected, may be prescribed by the laws of the several States and Territories respectively." The district court concluded that the considerable discretion given to state government officials to determine election procedures, particularly the discretion to set a time for a special election to replace a Representative, applied to the decision of *whether* to hold such a special election at all. The ACLU argues that Article I, section 2, clause 4 is mandatory; therefore the government must call for a special election.

Given the infrequency of House vacancies, and the even greater infrequency of governors refusing to call special elections to fill them, only one case, *Jackson v. Ogilvie*, deals with such a situation. *Jackson* arose when the governor of Illinois refused to call a special election after the death of a Representative on August 13, 1969. 426 F.2d at 1334. Voters brought suit on December 16, 1969, and "the district court dismissed the action for want of jurisdiction" on March 16, 1970, finding the rights asserted too insubstantial to support jurisdiction, as "the relatively short period in which the Sixth District will remain unrepresented" was not enough to raise constitutional questions. *Id*. at 1334-35. The Seventh Circuit reversed in an opinion issued on May 6, 1970,

concluding that the district court had erred by dismissing the action due to the limited time that a Representative would serve, stating, "Except in those instances [where the period of possible service could truly be deemed de minimis] the delegation to the state legislature of this power over procedure does not, in our opinion, alter the character of the Governor's duty to issue a writ of election." *Id*. at 1336. In so holding, the court found that a special election could still be held on November 3, 1970, the date of the next general election, and concluded that it was "not prepared to say as a matter of law that representation from the time the results of the November 3 election will be determined to January 3, 1971 is *de minimis*." *Id*. at 1337.

In comparing *Jackson* to the instant case, both parties agree that the time periods involved are important; they merely disagree on which time periods are important. Under Illinois law at that time, 162 days had to elapse between the issuance of the writ of election and the election itself. *Id*. at 1335. The Seventh Circuit held that the governor had a duty to issue a writ at the time of the Representative's death, which would have allowed an election to be held on January 23, 1970, with eleven months left on the term. *Id*. at 1337. When the district court dismissed the case, an election could have been held on August 25, 1970, with four months left on the term. Finally, the Seventh Circuit refused to hold as a matter of law that the amount of time between the certification of an election held on the next general election date, November 3, 1970, and the beginning of the next term, on January 3, 1971, is de minimis. The ACLU emphasizes *Jackson*'s indication that the time of possible service in the House in this case, November 5, 2002 to January 3, 2003, was not de minimis. Conversely, Governor Taft emphasizes that *Jackson* only conclusively held that an enforceable duty existed when eleven months remained on the term at the time the vacancy occurred.

The parties and the district court cite three other cases that influence our decision in this case. In *Valenti v. Rockefeller*, 292 F. Supp. 851, 853 (W.D.N.Y. & S.D.N.Y. 1968) (three-

judge district court), *aff'd mem.*, 393 U.S. 405 (1969), a U.S. Senate vacancy occurred in June 1968 upon the assassination of Senator Robert F. Kennedy, and state statutory law mandated that the vacancy would be filled in November 1970, as sixty days were required prior to the primary election, and replacement Senate elections were to be held in even-numbered years. The plaintiffs in *Valenti* argued that the operation of state law unconstitutionally denied them their rights to vote and to representation. *Id.* The district court determined that the delay was constitutional when balanced against the state interests of voter turnout and interest; of preserving local elections from "the more party-oriented political currents generated by statewide or national contests"; and of avoiding the economic hardship on Senate candidates of financing a campaign in the off-year.[3] *Id.* at 854, 859. In *Mason v. Casey*, No. 91-5728, 1991 WL 185243, at *1-2 (E.D. Pa. Sept. 18, 1991), a House vacancy occurred on September 11, 1991, and state statutory law mandated that the special election would be held at least sixty days after the governor issued a writ of election. Like in *Valenti*, the plaintiffs argued that the operation of state law created an unconstitutional delay beyond the plaintiffs' proposed date of November 5, 1991, and the district court held the delay which likely was five additional months to be constitutional. *Id.* at *2-3. Finally, in *State ex rel. Armstrong v. Davey*, 198 N.E. 180, 181 (Ohio 1935), the Ohio Supreme Court ratified the governor's decision to set a replacement date at a later date than the plaintiff felt was proper.

---

[3]The probativeness of *Valenti v. Rockefeller*, 292 F. Supp. 851, 853 (W.D.N.Y. & S.D.N.Y. 1968), is substantially diminished by the fact that it addressed a vacancy in the Senate. The United States Constitution allows Senate vacancies to be filled by the governor through a temporary appointment, and thus the seat may be filled during the period between the vacancy and the special election. U.S. Const. amend. XVII; *Valenti*, 292 F. Supp. at 855. Moreover, if one of a state's seats in the Senate becomes vacant, that state will still be represented in the Senate, whereas if one of a state's seats in the House becomes vacant, residents of that district will not be represented in the House. *Valenti*, 292 F. Supp. at 863.

Like the Seventh Circuit, we conclude that Article I, section 2, clause 4 is mandatory, requiring the state's executive to issue a writ to fill a vacancy in the House.[4] We recognize that there may be instances where the time remaining in the congressional term is truly de minimis, thereby excusing the executive from issuing the writ, but the time involved in this case cannot be considered de minimis.[5]

We also recognize that Article I, section 4, clause 1 gives states the discretion to determine the "Times, Places, and Manner" of holding such elections, and that the states have valid interests in ensuring fair and reliable elections. As *Valenti* and *Mason* indicate, legislative balancing between a state's interests in ensuring fair and reliable elections, and its citizens' rights to vote and to equal representation, is entitled

---

[4]We are not at all persuaded by the Supreme Court of Rhode Island's statement in *In re the Representation Vacancy*, 15 R.I. 621, 624 (R.I. 1887), that the governor, having the power under Article I, section 2, clause 4 of the United States Constitution, to issue a writ of election, also has the discretion to decide, considering the 49th Congress's adjournment date, whether to exercise that power. This statement is dicta and the decision is an advisory opinion, not binding on this court. Nor are we persuaded by similar non-binding dicta in *People ex rel. Fitzgerald v. Voorhis*, 119 N.E. 106, 108 (N.Y. 1918).

[5]The district court relied on the 107th Congress's scheduled adjournment date of October 3, 2002 in concluding that the ACLU had not met its burden of demonstrating irreparable harm, as the parties contemplated holding a November 5, 2002 election and there was no way of knowing whether a hold-over session would occur, and thus whether the Seventeenth District would be unrepresented in a House vote. We conclude the scheduled adjournment date should not be used in evaluating whether a special election may be held in compliance with state law and whether the time remaining after such an election would truly be de minimis. As history shows, the House rarely adjourns *sine die* on its schedule adjournment date, and important legislation has been passed after such date. In fact, the amicus brief filed by Representative Marcy Kaptur notes that the 107th Congress passed several pieces of important legislation after its scheduled adjournment date of October 3, 2002, including the Iraq war resolution (October 10) and the creation of the Department of Homeland Security (November 13).

to considerable deference. Ohio has exercised its discretion to determine the time, place, and manner of elections by enacting a comprehensive election code. Governor Taft complains of the expense, inconvenience, and possible inaccuracies that would have accompanied a special election held on November 5, 2002. We point out that the Ohio legislature, through its election code, has determined the length of time it considers necessary for conducting such a special election. If the Ohio legislature determines that more time is needed to hold such an election, it may amend its election code, and should a need to review such provisions arise, we will accord them appropriate deference.

Had Ohio's election code imposed requirements that made a special election an impossibility in this case, the ACLU would have been faced with the burden of proving those enacted requirements were unconstitutional. As Governor Taft concedes, however, it would have been possible to hold a special election that complied with the requirements imposed by the legislature in the election code to fill the vacancy in the Seventeenth District.[6]

------

[6]To the extent that the Ohio election code purports to give unfettered discretion to Governor Taft regarding the time for calling the special election, it is not a meaningful standard entitled to deference. The Ohio code provides:

> When a vacancy in the office of representative to congress occurs, the governor, upon satisfactory information thereof, shall issue a writ of election directing that a special election be held to fill such vacancy in the territory entitled to fill it on a day specified in the writ.

Ohio Rev. Code Ann. § 3521.03. Moreover, the Ohio Supreme Court has interpreted an earlier, similar version of this provision as granting the governor discretion to decide *when* to call a special election, but not to decide *whether* to call an election. *State ex. rel. Armstrong v. Davey*, 198 N.E. 180, 181 (Ohio 1935). While the Eleventh Amendment prevents us from compelling Governor Taft to comply with state law, we may consider Governor Taft's failure to act consistently with Ohio law when determining how much deference to accord his decision under the Constitution's delegation of election procedures to the states.

In summation, we conclude that Article I, section 2, clause 4 imposed a mandatory duty upon Governor Taft to hold a special election to fill the vacancy in the District created by the expulsion of Traficant. Although there may be situations where an executive's duty is excused because the time remaining on the Congressional term is truly de minimis, this was not such a situation. While legislative balancing of the state's and its voters' interests is entitled to deference, a special election that complied with Ohio's election code could have been held in this case. Therefore, we hold that Governor Taft violated his duty to call a special election under Article I, section 2, clause 4 and denied ACLU members the rights to vote and to equal protection in violation of the Fourteenth Amendment. These constitutional violations entitle the ACLU to declaratory relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201 and to reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

### III. CONCLUSION

We conclude that the district court committed errors of law, and thus abused its discretion by failing to award the ACLU appropriate equitable and declaratory relief. Accordingly, we **REVERSE** the district court's decision and **REMAND** this case so the district court may award appropriate declaratory relief and attorney's fees to the ACLU.

---

### DISSENT

---

RYAN, Circuit Judge, dissenting. The majority holds that Governor Taft was required by Article I, § 2, cl. 4 of the U.S. Constitution to hold a special election to fill the vacancy caused by the expulsion of Congressman James A. Traficant from the U.S. House of Representatives. I do not believe the United States Constitution required Governor Taft to hold a special election in the circumstances of this case and so I must dissent.

### I.

Our Constitution grants limited, enumerated powers to the federal government, while reserving the remainder of the governing authority to the states. Beyond the unenumerated powers retained by the states, the Constitution delegates to them certain tasks necessary for the proper administration and functioning of the federal government. One such task is the duty imposed by Article I, § 2, cl. 4, which provides that "[w]hen vacancies happen in the Representation from any State, the Executive Authority thereof shall issue Writs of Election to fill such Vacancies." U.S. Const., Art. I, § 2, cl. 4.

Although clause 4 uses the imperative "shall," that should not be understood as a universal and absolute command to act without regard to the facts and circumstances that bear directly upon the purpose of Section 2. That is so, not only as a matter of common sense, but also because, under our Constitution, "[t]he States . . . retain 'a residuary and inviolable sovereignty.' . . . They are not relegated to the role of mere provinces or political corporations, but retain the dignity, though not the full authority, of sovereignty." *Alden v. Maine*, 527 U.S. 706, 715 (1999) (quoting The Federalist No. 39, at 245 (James Madison) (Clinton Rossiter ed., 1961)).

In interpreting clause 4 and similar provisions of the federal Constitution, we are obligated to take cognizance of the principles of federalism and comity that inhere in our unique system of dual sovereignty. Implicit in these principles is the obvious proposition that the Constitution does not impose upon the states the obligation to take action, which, in the circumstances at hand, would be wasteful, imprudent, and manifestly ineffective to carry into effect the purpose of the constitutional mandate.

The authors of Clause 4 were not theoreticians given to creating mindless formalisms that, if applied literally, woodenly, or mechanistically, would require the states to take action in obedience to the verb "shall," which, under the circumstances, is foolish, wasteful, and probably ineffective.

Neither constitutional "textualism," "originalism," nor any other interpretive "ism" requires that, in carrying out the mandate of Clause 4, a Governor abandon all common sense and reasonableness and become, instead, a mere issuing clerk when a "vacanc[y] happen[s]" in a state's congressional representation.

As Justice Oliver Wendell Holmes, speaking for the U.S. Supreme Court, stated, albeit with regard to a different constitutional provision:

> The interpretation of constitutional principles must not be too literal. We must remember that the machinery of government would not work if it were not allowed a little play in its joints.

*Bain Peanut Co. of Tex. v. Pinson*, 282 U.S. 499, 501 (1931). That "play in its joints" must certainly include a Governor's discretion to respond to the mandatory language of Clause 4 in a reasonably sensible manner.

## II.

With these principles in mind, I conclude that, given the circumstances Governor Taft faced when former Congressman Traficant was expelled from Congress, he was not required under clause 4 to call a special election. The vacancy in the 17th district "happen[ed]" on July 24, 2002, slightly more than three months before the general election and less than six months before the end of the congressional term.

After taking into account the public notice requirements of Ohio's election laws and the need for a *primary* election and a general election, Governor Taft concluded, and the plaintiff has conceded, that the earliest practical date on which a special election could have been held was November 5, 2002, the date of the general election. In order to have held a special election on the date of the general election, the financially strapped counties that comprised the 17th district would have been required to expend significant amounts of money and effort to give notice of the vacancy to potential candidates, print primary as well as general election ballots, pay additional election workers to staff the polling stations, certify the results, and allow for possible challenges.

In addition to these demands on the resources of the affected Ohio counties, the Governor was faced with a unique circumstance that could only have added further confusion to the already confusing necessity of conducting a special election together with the regular general election. As the majority points out, the 17th district was redrawn in 2002. The "old" 17th district represented by Traficant comprised Mahoning and Columbiana Counties and parts of Trumbull County. But the decennial 1990 census required reapportionment and resulted in a "new" 17th district comprising parts of Mahoning, Trumbull, Portage, and Summit Counties. Consequently, on election day, some voters in the affected counties would have had the option of voting for two congressional candidates, neither of whom was an incumbent 17th district congressman: one to fill the short-term vacancy in the *old* 17th district and another to represent the *new* 17th district in the next session of Congress. Adding to the confusion, voters whose precincts were recently added to the 17th district would have been eligible to vote for only one candidate and could not have participated at all in the special election. With this confusing array of possibilities, candidates and election workers would have faced the formidable task of explaining to voters why some of them were being asked to take the extraordinary step of voting for two congressional representatives, while their neighbors were being asked to vote for only one.

Despite the obvious cost and confusion, a special election might nevertheless have been required were it not for the very real likelihood that Congressman Traficant's replacement would have arrived too late to represent the citizens of the 17th district. Because Ohio election law imposes certain delays for canvassing (Ohio Rev. Code Ann. § 3505.32 (Anderson Supp. 2003)), counting overseas ballots (Ohio Rev. Code Ann. § 3509.05 (Anderson 1996)), and permitting applications for a recount (Ohio Rev. Code Ann. § 3515.02 (Anderson 1996)), the earliest the special election could have been certified and, therefore, the earliest any newly elected representative could have participated in the business of the House, was on November 25, 2002. *See* Ohio Rev. Code Ann. § 3505.38 (Anderson 1996). Against this backdrop, Governor Taft—unless Clause 4 renders him a mindless automaton—had to consider, in addition to cost and voter confusion, that, at the time the ACLU filed its complaint, the House was scheduled to adjourn *sine die* on October 3, 2002, almost two months *before* any newly elected representative from the 17th district could have taken his or her seat. He would also have been obligated to consider that since 1933, the year in which the Congress changed its start date to January 3, the House has only reconvened after the general election approximately one out of every three times.

At oral argument before the district court, the ACLU speculated that a special election "could have" permitted a newly elected representative from the 17th district to vote in one of these infrequent lame duck sessions of Congress. In fact, as proved by later events, Congress did reconvene for a lame duck session. However, it adjourned on November 22, 2002, three days *before* a newly elected representative from the 17th district could have taken his or her seat. Although the majority implies otherwise, there was never any possibility that the 17th district could have been represented in the House votes on the Iraq war resolution, which took place on October 10, or on the creation of the Department of Homeland Security, which took place on November 13. *See* maj. op. at 12 n.5. Nor, contrary to the majority's contention, is there any evidence in the record that the citizens of the 17th district suffered from "diminished constituent services" as a result of the Governor's refusal to hold a special election. Maj. op. at 3. House Rule 2(i)(1) provides that, in the event of a vacancy, the Clerk of the House of Representatives shall continue to supervise a congressman's staff, thereby ensuring the continuation of constituent services. Moreover, when questioned by the district court on this issue, the ACLU expressly disavowed any injury related to constituent services.

### III.

Governor Taft was undoubtedly bound by the language of Clause 4, but implicit in that Section is the duty to exercise a limited discretion to assure that the execution of the mandate does not, under the circumstances, amount to a wasteful, unduly confusing, and very probably ineffective and useless election.

Given the substantial cost of a special election, the likelihood of confusion, and the high probability, as proved by later events, that a newly elected representative would not have been able to take his or her seat, I do not believe that Governor Taft was required to hold a special election to fill

the vacancy caused by the expulsion of Congressman James Traficant from the House. Holding a special election under these circumstances would have been absurd and meaningless, and in holding that the Governor was obligated to do so, this court pays no more than mere lip service to those principles of federalism and comity that are inherent in the Constitution. What's worse perhaps, under its "capable of repetition, while evading review" exercise of jurisdiction, maj. op. at 6, the court implicitly mandates mindless compliance with Clause 4 in the future, in an even more absurd and unreasonable circumstance.

I respectfully dissent.